STATE of Utah, Plaintiff and
Respondent,

v.

Richard A. NEBEKER, Defendant
and Appellant.

No. 17491.

Supreme Court of Utah.

Jan. 25, 1983.

James A. Valdez, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Robert N. Parrish, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

SAM, District Judge:

Defendant Richard A. Nebeker appeals a jury conviction of burglary (U.C.A., 1953, 76–6–202) and aggravated assault (U.C.A., 1953, 76–5–103) rendered in the Third Judicial District Court. Defendant contends that the disassembly of photo arrays and

subsequent witness identification of the defendant denied him his right to due process of law. Defendant also contends that the evidence before the jury was insufficient to meet the "beyond-a-reasonable-doubt standard" required to support the jury conviction.

The facts reflect that at about 11:40 a.m. on September 24, 1979, there was a knock at the door of the home of Kathy Thames in Sandy, Utah. Mrs. Thames answered the door and encountered a man who asked if she knew whether a person by the name of Dawn Davis lived in the area. Mrs. Thames said she did not know of such a person, whereupon the man asked to borrow her phone book. Mrs. Thames got her phone book from the kitchen and handed it to the man through the door. Apparently unable to locate the address, the man asked to use Mrs. Thames' telephone. When she said "no," the man entered the house. Within seconds he had grabbed her right arm, holding it behind her back, and placed his arm around her neck. She screamed and the man told her to "shut up." Although she does not remember anything more about the assault, Mrs. Thames' cheekbone was shattered, her jaw was broken, and her right ear was nearly severed from her head.

Based upon her general description, the police constructed several photo arrays. Mrs. Thames could not identify her assailant from the first array and the individual photos were returned to their catalogs. She subsequently selected three photos of an eight-photo spread, one of which was of defendant. Again, on November 7, 1979, she selected defendant from a photo array, indicating that the facial features resembled those of her assailant. She also selected a second photo at that time, and explained that the hair styling of that individual was similar to that of her assailant. Although from the photographs, she could not positively identify the man who had beaten her, she did unequivocally identify the defendant at a lineup in December, 1980.

Two of Mrs. Thames' neighbors also testified as witnesses. LaRue Weaver said that at about 11:30 a.m. on September 24, 1979, she saw a man in the neighborhood "acting peculiar." She watched him for about 5 minutes at a distance of 70 feet. Her description of his attire matched that of Mrs. Thames'. About 6 months after the incident in question, Mrs. Weaver identified defendant from a photo array as the man walking in the neighborhood just before the attack on Mrs. Thames.

Michelle Grubb also testified that on September 24, 1979, a man had come to her door and had asked if she knew "Dawn Day." She replied that she did not, and the man asked to borrow her phone book. Mrs. Grubb handed the phone book to the man, who then requested a pencil and paper. The man wrote something on the paper and left. Mrs. Grubb could not identify the man from either the lineup or the photo array shown Mrs. Thames. Her description of the man differed substantially from the description supplied by Mrs. Thames.

At trial, defendant tried to establish an alibi. Allen McCoy testified that defendant stayed at his home on the night of September 23, 1979, and that defendant was still asleep on the couch at 12:15 p.m., September 24, when McCoy left for work.

The jury returned verdicts of guilty. Defendant appealed after his motion for a new trial was denied. On appeal, defendant contends that the photographic identification procedures created a "substantial likelihood of irreparable misidentification," and therefore his conviction must be reversed as a matter of law.

In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court applied the standard for evaluating pretrial photographic identifications which are alleged to be "unnecessarily suggestive and conducive to misidentification." The Supreme Court concluded that:

[E]ach case must be considered on its own facts, and that convictions based on eye-

witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a *very substantial likelihood or irreparable misidentification.* [Emphasis added.]

The Court's main concern in applying this standard is to insure that any identification subsequent to the pretrial identification by photograph is a genuine product of the knowledge and recollection of the witness. This Court in *State v. Perry,* 27 Utah 2d 48, 492 P.2d 1349 (1972), stated:

When such a question is raised it should not depend on whether the procedures followed comply with a formula designed for some other case and extrapolated to cover all possible situations. But the circumstances of the individual case should be scrutinized carefully by the trial court to see whether in the identification procedures there was anything done which should be regarded as so suggestive or persuasive that there is a *reasonable likelihood that the identification was not a genuine product of the knowledge and recollection of the witness,* but was something so distorted or tainted that in fairness and justness the guilt or innocence of an accused should not be allowed to be tested thereby. [Emphasis added.]

492 P.2d at 1352.

■ The facts of this case do not support the view that the photo identification procedures were so suggestive or persuasive that there was a reasonable likelihood that subsequent identifications were not a genuine product of the knowledge and recollection of the witnesses. Although defendant challenges discrepancies between Mrs. Thames' initial description of her assailant and the physical characteristics of the defendant and the suggestiveness implicit in the recurrence of defendant's photograph in three of the arrays, several factors militate against the possibility of misidentification. Primar-

ily, Mrs. Thames positively and unequivocally identified defendant at the lineup, both by appearance and by voice. On the day of the assault, Mrs. Thames viewed the assailant's unmasked face in broad daylight for a substantial period of time. She made no positive identification from the photo arrays, but at no time did Mrs. Thames pick anyone other than the defendant as her assailant. She did, however, identify defendant's photograph as being the one most closely resembling his facial features. We conclude that Mrs. Thames' subsequent identifications were the genuine product of her knowledge and recollection and that, therefore, there was no "substantial likelihood of irreparable misidentification."

■ As to the discrepancies between Mrs. Thames' initial description of her assailant and defendant's physical characteristics, these are primarily matters of the credibility of the witness best left to the finders of fact. Although Mrs. Thames apparently contradicted herself as to whether or not her assailant was "heavy-set" and other details, the reliability of her identification is not necessarily impugned because her initial description did not precisely match the defendant. Her description of the assailant was generally consistent with defendant's appearance, and it was the jury's duty to resolve the reliability of the testimony.

Defendant also claims that Mrs. Weaver's identification of the defendant was "patently unreliable" because she lacked the adequate opportunity to observe the assailant because they were separated by a distance of 70 feet; her initial description, her description at trial, and the defendant's appearance were not entirely consistent; and she did not make any identification until nearly six months after the incident occurred.

■ The Court does not believe that there is a substantial likelihood of misidentification. Mrs. Weaver carefully observed the individual in question for five minutes in the noonday light, having focused her

attention on him because of his peculiar behavior and she identified the defendant's picture in each array in which it was included. Mrs. Weaver's photographic identifications were conducted independently from those of Mrs. Thames. She positively identified the defendant from the photographs and from his appearance at trial. The issues of the distance between the witness and the individual, the discrepancies in descriptions, and the time between the incident and the identification go to the credibility of the witness, which is best determined by the factfinders.

Defendant also contends that his due process rights were compromised by the State's failure to preserve photo arrays shown to the victim before the defendant was identified in a lineup and at trial. He specifically claims that he should have had the opportunity to see the first arrays which Mrs. Thames said did not contain her assailant's picture. He argues that the arrays were potentially prejudicial or exculpatory (if defendant's picture was included therein) and thus were material to defendant's guilt or innocence. Defendant cites the case of *State v. Stewart,* Utah, 544 P.2d 477 (1975), for the proposition that due process is denied where "evidence material to the guilt or innocence of the defendant in a criminal case" is deliberately suppressed or destroyed.

■ The materiality required to reverse a criminal conviction for suppression or destruction of evidence as a denial of due process is more than evidentiary materiality. In the Stewart case, defendant was convicted of unlawful distribution of marijuana. The undercover agent who purchased the drugs had taped the transaction with the defendant, but had erased the tape for use in other investigations. At trial, defendant moved to require the prosecution to produce the tape. The motion was denied and, on that basis, defendant sought reversal of his conviction as a denial of due process. This Court affirmed the conviction, and therefore held that the suppressed evidence was not material in the constitutional sense, because there was no showing that the material recorded on the tape was "vital to the issue of whether or not the defendant was guilty of the charge," and there was no showing of "a fundamental unfairness which would require the court to set aside the defendant's conviction."

The case of *State v. Hudspeth,* 22 Wash. App. 292, 593 P.2d 548 (1978), clarifies the constitutional standard of materiality in a factual pattern similar to the case now before the Court. The *Hudspeth* case deals with the issue of materiality in terms of the prosecution's duty to preserve and disclose photo arrays used to identify the defendant. The case held that "the duty to preserve an array arises from the *reality* of prejudice to the defendant by the failure to preserve it." (Emphasis added.) The reasoning was explained as follows:

Fundamental to either duty [the duty to preserve evidence or the duty to disclose it] is the prerequisite that the evidence destroyed, disposed of, or suppressed by the prosecution was material in the constitutional sense. *The mere possibility that an item of undisclosed evidence might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.* [Emphasis added.]

Accord, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

■ Applying the standards of materiality as stated in the *Stewart* and *Hudspeth* cases, this Court does not believe defendant is entitled to reversal for the destruction or suppression of evidence. In this case, the defendant was not affirmatively identified in the unpreserved array nor did the witnesses fail to identify the defendant from an array in which the defendant's photograph had been specifically placed after the investigation focused on the defendant. In light of these factors and testimony that defendant's photograph did not appear in those arrays, the Court concludes that de-

fendant's claim is based on a mere possibility that the photo arrays might have affected the trial outcome and, therefore, the inability of the prosecution to reconstruct those arrays is not material in the constitutional sense. Defendant's contentions that the officer who testified that defendant's picture was not in the array had no reason to remember whether or not defendant's picture was there because the investigation had not yet focused on the defendant, and that the officer did not know the majority of the names of the men depicted in the array, does not elevate defendant's claim above mere speculation. The record fails to show a fundamental unfairness which would require the Court to set aside the defendant's conviction. This is especially true where the Court has concluded that the subsequent identification was the genuine product of the knowledge and recollection of the witnesses.

██ Finally, defendant asserts that based on the evidence adduced at trial, no reasonable jury could have found defendant guilty beyond a reasonable doubt in light of the testimony of Mrs. Grubb. Although Mrs. Grubb testified that she had been visited on the day of the assault by someone seeking to locate "Dawn Day," Mrs. Grubb failed to identify the defendant from any of the photo arrays containing his picture and concluded that the person who came to her house on the day in question was not in the lineup from which Mrs. Thames identified the defendant.

In the case of *State v. Wilson,* Utah, 565 P.2d 66 (1977), this Court enunciated the standard for reversing a jury conviction on the ground of insufficiency of the evidence:

> [W]e are obliged to assume that the jury believed those aspects of the evidence, and drew those inferences that reasonably could be drawn therefrom, in the light most favorable to the verdict. In order for the defendant to successfully challenge and overturn a verdict on the ground of insufficiency of the evidence, it must appear that upon so viewing the evidence reasonable minds must necessarily entertain a reasonable doubt that the defendant committed the crime.

565 P.2d at 68.

This Court does not believe this standard requires reversal. As the State points out, the jury could reasonably have inferred from the evidence that either Mrs. Grubb was mistaken as to the identity of the person who came to her house or that there were two different men in that neighborhood on the day in question.

Accordingly, the jury conviction is affirmed.

HALL, C.J., and OAKS and HOWE, JJ., concur.

STEWART, J., concurs in the result.

DURHAM, J., having disqualified herself, does not participate herein.