STATE of Utah, Plaintiff and Respondent,

v.

Daniel Edward SHAFFER, Defendant and Appellant.

No. 18556.

Supreme Court of Utah.

June 25, 1986.

Curtis Nesset, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., John P. Soltis, Deputy Co. Atty., Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

The defendant, Daniel Edward Shaffer, was convicted after a jury trial of first degree murder, a capital offense in violation of U.C.A., 1953, § 76–5–202; aggravated robbery, a first degree felony in violation of U.C.A., 1953, § 76–6–302; and theft, a second degree felony in violation of U.C.A., 1953, § 76–6–404. After a penalty hearing, the trial judge sentenced the defendant to a term of life imprisonment on the murder conviction, a term of five years to life for aggravated robbery, and a term of one to fifteen years for theft. The defendant assigns seven errors for review: (1) the cremation of the victim's body violated the defendant's due process rights; (2) the aggravated circumstance of first degree murder titled "other personal gain" is void for vagueness and therefore that portion of the murder charge should have been dismissed; (3) the trial court failed to exclude evidence of the defendant's other

bad acts; (4) the questioning of the jury venire for "death qualification" deprived the defendant of a fair and impartial jury; (5) the trial court failed to give a "reasonable alternative hypothesis" instruction to the jury; (6) the trial court improperly sentenced the defendant for both first degree murder and the lesser included offenses of aggravated robbery and theft; and (7) the evidence was insufficient for a murder conviction. We affirm the conviction and sentence for first degree murder and vacate the convictions of theft and aggravated robbery.

On August 23, 1980, the naked, partially decomposed body of Jack Croasdale was found in a brushy area 20–30 feet off the road in East Canyon in Salt Lake County. The medical examiner performed an autopsy on the body and concluded that the cause of death was a single bullet wound to the forehead. Approximately four months later, on December 12, 1980, the defendant was arrested in Portland, Oregon. At the time of arrest, the defendant was driving Mr. Croasdale's van and was using the name and identification of the victim.

The defendant testified at trial that he met Mr. Croasdale in Reno, Nevada. Mr. Croasdale had stopped in Reno on his way from San Francisco to his home in Kenosha, Wisconsin. The defendant had hitchhiked to Reno several days earlier from Omaha, Nebraska. The defendant, who had only eighty cents, arranged to drive with the victim back to Omaha in search of better work and to collect several minor debts. At the time they met, the defendant was using the identification of Joseph Lucero, a former roommate at St. Andrews Abbey in Denver, Colorado. The defendant took Lucero's identification when the defendant left the abbey because he feared the police would stop him and discover a probation violation related to an Arizona conviction. On August 5, 1980, the defendant had used Lucero's identification to obtain a gun permit, a .38 caliber handgun, and ammunition in Omaha, Nebraska.

The defendant testified that on August 15, 1980, he and Mr. Croasdale drove east on I–80 in Croasdale's van and arrived in Salt Lake City that evening. After drinking several beers in a local bar, they went to sleep in the back of Croasdale's van. The defendant testified that early the next morning he was awakened by a homosexual attack by Croasdale. The defendant claims he stated that he wished to leave and then picked up his backpack, clothing, and sleeping bag. In the course of events, the backpack fell over, and the defendant's loaded gun slipped out of the pack and partially out of the holster. According to the defendant, Croasdale then picked up the gun and threatened the defendant. In the ensuing struggle, the gun fired and the bullet struck Croasdale just above the right eyebrow. Although the defendant was unsure of the exact distance between the gun and the victim's forehead, a courtroom demonstration suggested that the defendant's version of the events required the distance to be about twelve inches.

The defendant admitted that he dumped Croasdale's body in East Canyon that night; took Croasdale's van and identification; spent Croasdale's money in Salt Lake City; drove the van to Las Vegas, where the defendant used Croasdale's name, identity, credit card, and checks; and later drove to Portland, where the defendant assumed Croasdale's identity. Throughout the trial, the defendant insisted that Croasdale died of an accident and that the defendant made the decision to take Croasdale's van after his death.

The State presented testimony from several witnesses to substantiate a theory of murder. The state medical examiner performed an autopsy and carefully examined and photographed the body to determine the cause of death. Based on the perpendicular entry and downward trajectory of the bullet, the clean entry wound, and the absence of stippling or other sooty deposits around the wound, the medical examiner concluded the death of Jack Croasdale was a homicide as the fatal bullet was fired from a distance at least eighteen inches from the head and from a point outside the

reach of the victim. That opinion was corroborated at trial by officers from the Salt Lake County Sheriff's office, who compared standard test fire patterns from a .38 caliber police special with the wound of the victim. The officers concluded that since there was no powder stippling or scorching, the wound was not caused by a gun fired at close range.

Because of decomposition and the fact that the body remained unclaimed for one and one-half months, it was released to the University of Utah Medical Center for disposal on October 1, 1980, and was subsequently cremated. Prior to releasing the body, the state medical examiner did not perform tests on the hands of the victim to determine the presence of chemical compounds commonly found on the hands of a person who has fired a pistol. According to the medical examiner, the presence of gunpowder residue would not have affected his opinion that the death was caused by homicide in light of all the circumstances in this case. The testimony of Mr. Donald Havekost, an FBI employee, supported the medical examiner's opinion. He noted that after exposure and decomposition as in this case, it is "highly unlikely" that powder residue would have been found on the victim's hands. Mr. Havekost further testified that a positive finding would not be significant in rendering an opinion as to whether the victim's hands were on the gun when it was fired.

The defendant made a pretrial motion for individual, sequestered death-qualification voir dire of the jury venire. This request was granted. Over the course of two and one-half days, each member of the jury venire was brought into the judge's chambers for questioning. Typically, the trial judge asked the prospective juror approximately ten questions covering about five pages of typewritten transcript; the questioning apparently lasted about five to ten minutes per person. After questioning by the court, counsel for the defendant and the State had the opportunity to ask potential jurors about other things, such as ownership and use of handguns, relationship to other criminal victims, and experience in

previous trials. After the trial judge finished questioning the potential jurors, he admonished them not to discuss the voir dire with other members of the venire. At the conclusion of voir dire, the State requested that two prospective jurors be excused for cause pursuant to U.C.A., 1953, § 77–35–18(e)(10) based upon their inability to impose the death penalty. That request was denied. The defendant proposed that seven prospective jurors be excused for cause pursuant to U.C.A., 1953, § 77–35–18(e)(14) because of their inclination to automatically impose the death penalty. Four persons were excused for that purpose.

## I.

The defendant first argues that the destruction of the victim's body prior to the defendant's motion for discovery violated his right to a fair trial mandated by the due process clause of the fifth and fourteenth amendments to the United States Constitution, and article I, section 7 of the Utah Constitution. The defendant argues that (A) the State failed to preserve evidence which could have been exculpatory; and (B) the State failed to conduct an adequate investigation which could have proved to be favorable to the defendant.

## A.

The defendant contends that the destruction of the victim's body prior to his discovery request denied him the opportunity to test the victim's hands for the presence of gunpowder residue. The defendant asserts that such evidence was exculpatory and material to his defense that Mr. Croasdale died in an accidental shooting.

The decisions of this Court and the United States Supreme Court have established the standards to be applied to determine whether evidence should be disclosed by the prosecution upon request. As a general rule, the prosecution violates a defendant's constitutional right to a fair trial where, after request, the prosecution suppresses evidence favorable to the defend-

ant that is material to guilt or to punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); *State v. Jarell,* 608 P.2d 218, 224 (Utah 1980). The intent or purpose of the prosecution in destroying the evidence is irrelevant. *See id.* at 224; *accord United States v. Agurs,* 427 U.S. 97, 104–05, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976). In *United States v. Agurs,* the murder victim's criminal record was held not to be material, and therefore the prosecution's failure to disclose it did not deprive the defendant of a fair trial.

In *State v. Stewart,* 544 P.2d 477 (Utah 1975), this Court held that a tape recording destroyed by a police officer before trial did not violate the defendant's due process rights where the statements on the tape were not shown to be "vital" to the issue of the defendant's guilt or innocence. *Id.* at 479. *See also Codianna v. Morris,* 660 P.2d 1101, 1108 (Utah 1983) (withholding of exculpatory testimonial evidence by prosecution did not violate due process where such evidence was tangential or cumulative); *State v. Nebeker,* 657 P.2d 1359, 1363 (Utah 1983) (failure of State to preserve photo array shown to victim before defendant was identified in lineup and at trial was not violative of due process). In *State v. Nebeker,* we further explained the definition of "materiality" and said, "The materiality required to reverse a criminal conviction for suppression or destruction of evidence as a denial of due process is more than evidentiary materiality." *Id.* at 1363. The evidence must be material in the constitutional sense. *Id.* In *State v. Lovato,* 702 P.2d 101 (Utah 1985), we explained that

[c]onstitutional materiality requires that there be a showing that the suppressed or destroyed evidence is vital to the issues of whether the defendant is guilty of the charge and whether there is a fundamental unfairness that requires the Court to set aside the defendant's conviction. A corollary of this proposition is, "The mere *possibility* that an item of undisclosed information *might* have helped the defense, or *might* have affected the outcome of the trial does not

establish 'materiality' in the constitutional sense."

*Id.* at 106 (*quoting United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976), and adding emphasis thereto; other citations omitted).

The destruction of the body in this case is analogous to the destruction of fingerprints in *Adkinson v. State,* 611 P.2d 528, 533–34 (Alaska), *cert. denied,* 449 U.S. 876, 101 S.Ct. 219, 66 L.Ed.2d 97 (1980). In that case, the Alaska Supreme Court held that a police officer's unintentional handling of the murder weapon, in a manner which destroyed fingerprints of the victim that might have been on the gun, did not deprive the defendant of a fair trial. The court found that while the evidence may have corroborated the defendant's story, it would not have been exculpatory.

Like the destroyed fingerprints in *Adkinson,* the destruction of the victim's body in this case meant that the defendant could not corroborate his story with evidence of gunpowder residue on the hands of the victim. However, that evidence is not necessarily exculpatory nor is it material in the constitutional sense. The state medical examiner and Mr. Havekost of the FBI agreed that evidence of gunpowder deposits on the victim's hands would be "insignificant" in this case in light of the decomposition of the body, the exposure of the body to the elements and insects, the contamination of the hands, and the characteristics of the wound which indicated homicide. Furthermore, Mr. Havekost testified that it would be "highly unlikely" that one would find gunpowder residue on the hands of a body which had been dragged through a brushy area and then exposed to the elements for a week during the summer. This testimony was in agreement with that of the medical examiner. Mr. Havekost also testified that if gunpowder residue was found, it would only indicate the defendant's hands were near, and not necessarily on, the gun at the time it discharged. Thus, evidence of gunshot residue offered a "mere possibility" of evidence favorable to the defendant. While

that evidence would have corroborated the defendant's story, it was not "vital" to the question of guilt or innocence. The defendant, therefore, is not entitled to reversal for the destruction of the victim's body.

### B.

■ The defendant also contends that the destruction of the body is equivalent to suppression of evidence because of the State's failure to conduct an adequate investigation. In this regard, the defendant argues that the lack of evidence deprived him of his right to a fair trial, as well as his rights to effective assistance of counsel, compulsory process, confrontation of evidence, and equal protection. The defendant urges this Court to recognize a duty of the prosecution to gather all relevant evidence regardless of its impact on the success of the prosecution.

The prosecution in a criminal case is bound by law and professional ethics to assure that the defendant receives a fair trial. *See State v. Williams*, 656 P.2d 450, 454 (Utah 1982). Although the prosecution and investigators should preserve all incriminating and exculpatory evidence material to a case, *State v. Stewart*, 544 P.2d 477, 479 (Utah 1975) (dictum), the prosecution is not required "to search for exculpatory evidence, conduct tests, or exhaustively pursue every angle on a case." *State v. Hall*, 22 Wash.App. 862, 867, 593 P.2d 554, 558 (1979); *see also Dalton v. State*, 251 Ga. 641, 641, 308 S.E.2d 835, 836 (1983) (failure to search for or preserve evidence of victim's fingerprints on shotgun barrel was not error); *State v. Rhodes*, 112 Ariz. 500, 504, 543 P.2d 1129, 1133 (1975) (failure to search for fingerprints in certain areas of crime scene was not error).

Appellant's proposed standard, which would impose a duty on the prosecution to search for all relevant evidence, would require Herculean efforts by the prosecution. In *State v. Jarell*, 608 P.2d at 218, this

Court noted the difficulty the prosecution faces in trying to second-guess a defense attorney concerning evidence that may be potentially relevant to a crime. *Id.* at 225. This difficulty is even more pronounced before a suspect has been arrested and the prosecution has been informed of the possible defenses of the accused. Evidence becomes relevant only after the legal theories in the case have been identified. To require the prosecution to gather all "relevant" exculpatory evidence before a suspect has been identified and before the State is notified of possible defenses, is to require the impossible.

We agree with the State of Washington that the appropriate standard requires the prosecution "to preserve that [evidence] which comes into [the prosecutor's] possession either as a tangible object or sense impression, if it is reasonably apparent the object or sense impression potentially constitute [sic] material evidence." *State v. Hall*, 22 Wash.App. at 867, 593 P.2d at 558. Where the "tangible object" is the body of a homicide victim, the State is not required to keep the body for an indeterminate amount of time. A concern for human decency and preventing the spread of disease requires that unclaimed bodies be buried. *See* U.C.A., 1953, § 26–4–25 (1984).[1] Where the death appears to be caused by violence, gunshot, suicide or accident, the state medical examiner has the duty to take custody of the body, determine the cause of death, and complete written reports. *See* U.C.A., 1953, §§ 26–4–7, –9, –11. Under these standards, we cannot conclude that the destruction of the victim's body in this case denied the defendant due process or equal protection of the law. The medical examiner performed an autopsy in which he measured, weighed, and photographed the body in an attempt to identify it and determine the cause of death. That evidence was preserved in the form of photographs and written reports and was subject to cross-examination and

---

1. The statutory requirements of the Medical Examiner's Act, U.C.A., 1953, §§ 26–4–1 to –25, were not enacted until 1981, after the State disposed of the body in this case. Nonetheless, the public policy concerns and duties described by the statute apply with equal force to this case.

confrontation. Although the hands of the body were not tested for the presence or absence of gunpowder residue, the defendant has not shown that such evidence was material to the issue of guilt or innocence. Therefore, there was no constitutional violation in the destruction of the body.

## II.

■ The defendant next argues that the trial court erred in denying his motion to dismiss that part of the information which charged the defendant with committing a homicide for "other personal gain" on the ground that this language is unconstitutionally vague, in violation of the eighth and fourteenth amendments to the United States Constitution, and article I, sections 7 and 9 of the Utah Constitution.

There are several alternative aggravating circumstances which may be elements of first degree murder under U.C.A., 1953, § 76-5-202. Those aggravating circumstances include murder in the course of aggravated robbery, murder for pecuniary gain, and murder "for other personal gain." The jury in this case was instructed on aggravated robbery as a separate offense and found the defendant guilty.

Because of the jury's verdict on aggravated robbery, we know that the jury found, unanimously, that the defendant committed that crime. Since that crime was one of the circumstances on which the jury was instructed regarding first degree murder, we know also that the jury properly relied on aggravated robbery in convicting the defendant of first degree murder. This is not a case where a general verdict is challenged in the absence of any indication of which of several alternatives was used by the jury to support the verdict. Because the jury convicted the defendant of aggravated robbery as a separate offense, we may uphold the jury's verdict on first degree murder under the robbery alternative, without addressing the constitutional adequacy of the "other personal gain" alternative.

The defendant also contends he was prejudiced in the penalty phase since the vagueness of "other personal gain" results in an arbitrary and capricious imposition of the death penalty, in violation of the eighth and fourteenth amendments. We reject this argument as well since the defendant did not receive the death penalty. *See Bumper v. North Carolina*, 391 U.S. 543, 545, 88 S.Ct. 1788, 1789, 20 L.Ed.2d 797 (1968).

## III.

■ The defendant next argues that the trial court erred when it denied the defendant's pretrial motion in limine to exclude evidence of the defendant's other bad acts, specifically, prior criminal convictions, forgeries, unauthorized use of credit cards, and theft. On appeal, the defendant challenges the admission of evidence pertaining to three possible prior crimes: violation of probation in Arizona; theft of Joseph Lucero's wallet and identification in Denver, Colorado; and theft of services for failure to pay for a hotel room in Omaha, Nebraska.[2]

Rule 55, Utah R.Evid., Vol. 9B, U.C.A., 1953 (1977), which was in effect at the time of trial, provides that other crimes or bad acts may be admitted "when relevant to prove some other material fact including absence of mistake or accident, motive, opportunity, intent, preparation, plan, knowledge or identity." While evidence of other bad acts is inadmissible to show the general disposition of the defendant, such evidence, when relevant and competent, is admissible to prove a material fact. *State v. Tanner*, 675 P.2d 539, 546 (Utah 1983). The defendant in this case was tried on three charges: murder, aggravated robbery, and theft. If evidence of prior bad acts was material to any of these crimes, there was no error.

---

**2.** The defendant's motion in limine covered a broader range of bad acts than the three acts argued on appeal. We assume that he has abandoned challenges to evidence of bad acts that are not mentioned in his brief.

The evidence of the defendant's probation violation in Arizona was relevant to the proof of a possible motive for the aggravated robbery and murder of Jack Croasdale and for the theft of his van. During the trial, the defendant admitted that he used the identity of Joseph Lucero because the defendant feared he would be apprehended and returned to jail if he were stopped and recognized by the police. Likewise, the defendant testified on direct examination that he obtained and kept the identification of Jack Croasdale to avoid problems if the defendant were pulled over while driving Croasdale's van. Thus, one logical motive for the murder and aggravated robbery is that the defendant wanted to obtain identification that would prevent his apprehension and prosecution by authorities for the Arizona probation violation. This motive is consistent with the defendant's disposal of Croasdale's unidentified, nude body in a remote location where it would not be readily discovered. The probation violation was therefore material to the defendant's motive for the murder, aggravated robbery, and theft. *Accord State v. Neal*, 123 Utah 93, 100–02, 254 P.2d 1053, 1056–58 (1953), *cert. denied*, 348 U.S. 982, 75 S.Ct. 573, 99 L.Ed. 765 (1955) (evidence of crimes in another jurisdiction material to murder of police officer where such evidence provided a motive to prevent apprehension).

██ Evidence that the defendant took Joseph Lucero's wallet and identification in Denver was relevant to establishing the identity of the defendant as the person in possession of the gun that killed Jack Croasdale. The defendant, posing as Joseph Lucero, received a gun permit and purchased the gun that killed Croasdale ten days later. The theft of Lucero's identification provided the first link in the chain of evidence that connected the .38 caliber weapon purchased in Omaha with the defendant and the death of Jack Croasdale. The defendant's use of Lucero's identification also explained the fact that the defendant was in Reno using Lucero's name at a blood plasma center and thus had the opportunity to drive to Salt Lake City with the victim. The defendant contends that identity was never at issue during the trial, but he never stipulated to identity. Without such a stipulation, the State must affirmatively carry its burden of proof to provide the chain of evidence connecting the murder weapon with the defendant.

██ The evidence of a possible theft of services from an Omaha hotel came out during the testimony of the hotel manager. The manager testified that the defendant registered and signed his name as "Joe Lucero" and stayed at the hotel during the period that the murder weapon was purchased at an Omaha pawn shop. The manager did not state whether or not the person who registered as "Joe Lucero" paid for the hotel room. Rather, the manager stated that on August 11, 1980, the person who registered as "Joe Lucero" "was gone," and the keys were left on the desk in the room.

While the trial court may have erred in permitting the isolated statement from which a possible theft of services might be inferred, we cannot review the alleged error since the defendant's motion in limine did not adequately describe the criminal act he was worried about, and he failed to make a timely objection at trial and therefore did not preserve that potential error for review. The defendant's motion in limine sought to exclude certain evidence of bad acts by the defendant. One of the bad acts mentioned in the motion was "theft." In describing to the trial court the bad acts covered by the motion, the defendant mentioned the theft of Joseph Lucero's wallet and identification, but failed to mention theft of services. We hold that where a motion in limine does not adequately describe the evidence complained of on appeal, that motion does not provide the trial judge with an opportunity to make a ruling, and a contemporaneous objection is necessary. *See State v. Lesley*, 672 P.2d 79, 82 n. 1 (Utah 1983) (objection must be made known to the trial judge so that he or she can make an informed decision to admit or exclude evidence); *State v. McCardell*,

652 P.2d 942, 947 (Utah 1982) (contemporaneous objection rule requires timely and specific objection to admission of evidence in order for the question of admissibility to be considered on appeal). Without a timely objection by the defendant, this Court cannot review the alleged error by the trial court.

■ The defendant also suggests that even if the evidence of other crimes was admissible, it should have been excluded under Rule 45, Utah R.Evid., Vol. 9B, U.C.A., 1953 (1977). Under Rule 45, the trial court has discretion to exclude evidence if the court finds that the probative value of the evidence is "substantially outweighed by the risk that its admission would consume unnecessary time, cause undue prejudice, or unfairly surprise a party." *State v. Tanner*, 675 P.2d 539, 547 (Utah 1983). We cannot say that the trial court abused its discretion in this case. The evidence of the defendant's probation violation and the theft of Lucero's wallet established the defendant's motive and identity. These were critical facts in a case that was built primarily on circumstantial evidence. The evidence was highly probative and outweighed the risk of undue prejudice. Therefore, we find no abuse of the trial court's discretion.

### IV.

■ The next issue we address is whether the trial court deprived the defendant of a fair and impartial jury by questioning the jury venire on its views toward the death penalty, in violation of the defendant's rights under the sixth, eighth, and fourteenth amendments to the United States Constitution, and article I, sections 7, 9, and 12 of the Utah Constitution. We do not treat, because it was not raised, the question of whether the *exclusion* of venirepersons for cause creates an unfair and partial jury. Instead, we focus on the defendant's contention that the voir dire *questioning* itself may bias the jurors who eventually hear the case, thereby violating the defendant's sixth amendment right to an impartial jury. According to the defendant, the questions regarding the death penalty and ability to impose that sanction required the prospective jurors to assume a guilty verdict before they could express their views of the death penalty and therefore predisposed them to find guilt at trial.

The purpose of questioning a jury venire on attitudes toward the death penalty is to identify those persons who would be unwilling to follow the law and vote to impose the death penalty, regardless of the facts. *See State v. Norton*, 675 P.2d 577, 589 (Utah 1983), *cert. denied*, 466 U.S. 492, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984). *See also* U.C.A., 1953, § 77–35–18(e)(10). In 1968, the United States Supreme Court held that a venireperson in a capital case may be excluded for cause if he or she is unwilling "to *consider* all the penalties provided by the state law." *Witherspoon v. Illinois*, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968) (emphasis in original). In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court examined the *Witherspoon* standard and noted that states retained a "legitimate interest in obtaining jurors who could follow their instructions and obey their oath." 448 U.S. at 44, 100 S.Ct. at 2526. The Supreme Court then concluded that *Witherspoon* and the line of cases which followed

> [establish] the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Id.* at 45, 100 S.Ct. at 2526. The Court went on to hold that certain venirepersons had been improperly excluded because of statements that the possible imposition of the death penalty would or might "affect" their deliberations. Without more, such a statement did not demonstrate "an unwillingness or an inability on the part of the

jurors to follow the court's instructions and obey their oaths." *Id.* at 50, 100 S.Ct. at 2529.

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court explained that the sixth amendment guarantee of an impartial jury does not entitle the defendant to a selection standard that will likely result in the seating of jurors in the defendant's favor:

> [T]here is nothing talismanic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries. *Witherspoon* is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment. Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an "impartial" jury consists of, and we do not think, simply because the defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor.

*Id.* at ——, 105 S.Ct. at 852, 83 L.Ed.2d at 851.

The standard of permissible exclusion under *Witherspoon* and its progeny is reflected in U.C.A., 1953, § 77–35–18(e)(10), which permits a challenge for cause on the following ground: "If the offense charged is punishable with death, the entertaining of such conscientious opinions about the death penalty as would preclude the juror from voting to impose the death penalty following conviction regardless of the facts...." We have interpreted that section to authorize removal for cause at the guilt phase if the prospective juror has scruples that would prevent him or her from imposing the death penalty. *See State v. Moore,* 697 P.2d 233 (Utah 1985); *State v. Norton,* 675 P.2d 577, 588–89 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984); *cf. State v. Redford,* 27 Utah 2d 379, 496 P.2d 884 (1972); *State v. Belwood,* 27 Utah 214, 494 P.2d 519 (1972).

The defendant argues that many social science studies since *Witherspoon* demonstrate that death-qualified jurors are more likely to convict a defendant and more inclined to impose the death penalty. According to the defendant, a death-qualified jury violates his right to a fair and impartial jury selected from a representative cross-section of the community.

Defendant's argument was flatly rejected by the United States Supreme Court in *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Court in *Lockhart,* assuming the social science studies on the subject to be adequate, held that the exclusion for cause of prospective jurors because of scruples toward the death penalty does not violate the defendant's sixth amendment rights. *Id.* 106 S.Ct. at 1764. The Supreme Court stated:

> The essence of a "fair cross-section" claim is the systematic exclusion of "a 'distinctive' group in the community." [*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).] In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors ... are not "distinctive groups" for fair cross-section purposes.
>
> We have never attempted to precisely define the term "distinctive group," and we do not undertake to do so today. But we think it obvious that the concept of "distinctiveness" must be linked to the purposes of the fair cross-section requirement. In [*Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)], we identified those purposes as (1) "guard[ing]" against the exercise of arbitrary power" and ensuring that the "common sense judgment of the community" will act as "a hedge against the overzealous or mistaken prosecutor," (2) preserving "public confidence in the fairness of the criminal justice system," and (3) implementing our belief that "sharing in the administration of justice is a phase

of civic responsibility." *Id.* at 530–31 [95 S.Ct. at 698].

*Lockhart,* 106 S.Ct. at 1765.

The Supreme Court concluded that the United States Constitution

presupposes that a jury selected from a fair cross-section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury so long as the jurors can conscientiously and properly carry out the sworn duty to apply the law to the facts of the particular case.

*Id.* at 1770. Thus, the exclusion of certain jurors following death qualification did not violate the defendant's sixth amendment right to a fair and impartial jury.

Moreover, the voir dire questioning of a jury about their views on the death penalty does not reach constitutional proportions. In *State v. Moore,* 697 P.2d 233 (Utah 1983), this Court found that death qualification voir dire is an appropriate method to identify and eliminate jurors who would refuse to follow the law. *Id.* at 238. Similarly, in *Lockhart v. McCree,* the United States Supreme Court rejected the contention that voir dire questioning on death qualification is unconstitutional. According to the Supreme Court, the State must be given the chance to identify prospective jurors whose death penalty scruples would prevent them from impartially determining a capital defendant's guilt or innocence. *Id.* 106 S.Ct. at 1763 n. 7.

While the opinions in *State v. Moore* and *Lockhart v. McCree* are controlling, we consider it helpful to discuss the only major study that examines the effects of the death-qualification questioning on jurors who go on to sit on capital juries. That study was conducted in 1979 by Professor Craig Haney and was discussed at length by the Arkansas district court in *Grigsby v. Mabey,* 569 F.Supp. 1273, 1292, 1302–05 (E.D.Ark.1983), *aff'd,* 758 F.2d 226 (8th Cir. 1985), *reversed, Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1985); and by the California Supreme Court in *Hovey v. Superior Court of Alameda County,* 28 Cal.3d 1, 75–81, 616 P.2d 1301, 1350–54, 168 Cal.Rptr. 128, 178–81 (1980). In the Haney study, sixty-seven subjects were randomly assigned to two different groups. Both groups were told to assume they were prospective jurors participating in a real voir dire. One group viewed a video tape of a two-hour voir dire of prospective jurors in a capital murder case that included one-half hour of the death-qualification questions. The second group viewed a video tape identical to the first except that the death-qualification portion was eliminated. At the conclusion of the video tapes, the subjects were asked certain questions.

Dr. Haney concluded that voir dire itself communicates attitudes and ideas to prospective jurors that may prevent them from deciding a case in an impartial manner. The results of his study were summarized by the district court in *Grigsby:*

The results of the Haney 1979 study showed that jurors exposed to the process of death qualification during voir dire, simply by virtue of that exposure, as compared to subjects not exposed to that process, are (1) more predisposed to convict the defendant, (2) more likely to assume before the trial begins that the defendant will be convicted and will be sentenced to death, and (3) more likely to assume that the law disapproves of persons who oppose the death penalty and (4) more likely to assume that the judge, the prosecutor *and the defense attorney* all believe the defendant to be guilty and that he will be sentenced to die and (5) are themselves far more likely to believe that the defendant deserves the death penalty.

569 F.Supp. at 1303 (emphasis in original). Despite the conclusion by the Haney study that unfairness and bias result from the death-qualification process, there is limited value to a single empirical study. The *Grigsby* court acknowledged this point when it stated: "Since the results of [the Haney] study appear to confirm the 'gut' opinions of those who daily operate in the courtroom environment[,] it is important to review it even though no one contends that

social science research on that problem is other than in its infancy." 569 F.Supp. at 1302. While the district court in *Grigsby* considered a two-jury system necessary to obtain a fair and impartial jury at the guilt phase, the California Supreme Court in *Hovey v. Superior Court* reached a different conclusion. The California Supreme Court noted:

> Haney testified that the prejudicial alteration in attitudes which resulted from a juror's observations of the death-qualification of his or her fellow venirepersons is "a function of exactly how extensive the questioning becomes. The more extensive the questioning, the more you would expect to find important differences between the state of mind of jurors who have been through the one process as compared to those who have been through the other." This proposition implies a corollary: "the extent to which [these effects] are minimal will be a function of the extent to which the questioning is minimized."

28 Cal.3d at 79–80, 616 P.2d at 1353, 168 Cal.Rptr. 180–81. Based on this analysis, the California Supreme Court concluded that the side effects of death-qualification voir dire could be minimized by individual sequestered voir dire. *Id.* at 80–81, 616 P.2d at 1354, 168 Cal.Rptr. at 181. According to the court, "Such a reduction in the pretrial emphasis on penalty should minimize the tendency of a death-qualified jury to presume guilt and expect conviction." *Id.* at 80, 616 P.2d at 1353, 168 Cal.Rptr. at 181 (footnote omitted). We agree.

We therefore hold that the individual, sequestered death-qualification voir dire of prospective jurors in a capital homicide case does not, in and of itself, violate the defendant's rights to a fair and impartial jury. Since the prospective jurors in this case were briefly questioned individually by the judge, in chambers, regarding their views on the death penalty and their ability to decide this case impartially, the defendant was not denied a fair and impartial jury.

## V.

 The defendant next contends that because his conviction was based largely on circumstantial evidence, he was entitled to a "reasonable alternative hypothesis" instruction. Our recent opinion in *State v. Hansen*, 710 P.2d 182 (Utah 1985), is controlling on this issue. There we affirmed our rule that such an instruction is unnecessary "where the jury is instructed that the State must prove a defendant's guilt beyond a reasonable doubt." *Id.* at 183. Instruction No. 10 in this case explained the burden of proof placed on the State and explained the meaning of "reasonable doubt." Therefore, there was no error.

## VI.

 The next issue is whether the predicate or underlying felony of felony murder is a lesser included offense thereby barring conviction of both first degree murder and the predicate felony. The defendant contends that separate sentences for felony murder and the "underlying offenses" of aggravated robbery and theft violate both the double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, and section 76–1–402 of the Utah Code. Because we agree with the defendant's statutory interpretation, we do not address the constitutional question.

The defendant argues that theft is a lesser included offense of aggravated robbery and that aggravated robbery is a lesser included offense of first degree murder. U.C.A., 1953, § 76–1–402(3) provides a statutory definition for lesser included offenses:

(3) A defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged. . . .

The threshold question is two-fold: first, whether theft is a lesser included offense of aggravated robbery and, second, whether aggravated robbery, the predicate felony for first degree murder, is a lesser included offense of first degree murder. In *State v. Hill*, 674 P.2d 96 (Utah 1983), this Court held under the facts of that case that the crime of theft is a lesser included offense of the crime of aggravated robbery and that the defendant could not be sentenced for both offenses. In defining included offenses, the Court stated that "where the two crimes are 'such that the greater cannot be committed without necessarily having committed the lesser,' *State v. Baker*, 671 P.2d 152, 156 ([Utah] 1983), then as a matter of law they stand in the relationship of greater and lesser offenses, and the defendant cannot be convicted or punished for both." *Hill*, 674 P.2d at 97. Our holding in *Hill* is dispositive of this issue. Since the same criminal act of taking Croasdale's personal property was necessary to the theft and aggravated robbery charges, theft is a lesser included offense of aggravated robbery. The lesser offense of theft therefore merges into the greater offense of aggravated robbery; thus, the trial court improperly convicted and sentenced the defendant for theft.

In determining whether aggravated robbery is a lesser included offense of first degree murder, we follow the analysis suggested by our opinion in *State v. Hill*, 674 P.2d at 97. Where a crime such as first degree murder has multiple variations, a theoretical comparison of the elements is insufficient, and it becomes necessary to examine what was actually proved at trial to determine if the predicate felony is a lesser included offense. *Id.*

First degree murder requires proof of a statutorily defined aggravating circumstance in addition to an intentional and knowing killing. In this case, the amended information charged that the defendant "intentionally and knowingly caused the death of Jack Croasdale while engaged in the commission of or an attempt to commit or flight after committing or attempting to commit Aggravated Robbery or Robbery or the homicide was committed for pecuniary or other personal gain." The prosecution introduced evidence to find the defendant guilty of first degree murder under each of the three possible aggravating circumstances charged—aggravated robbery, pecuniary gain, and other personal gain. The verdict forms returned by the jury did not indicate which aggravating circumstance they relied upon to find the defendant guilty. The fact that the jury also found the defendant guilty of aggravated robbery, however, allows us to assume, as discussed earlier, that aggravated robbery served as an aggravating circumstance.

Under the facts of this case, therefore, proof of aggravated robbery was a necessary element to proof of first degree felony murder. There can be no doubt that, standing alone, the crimes of aggravated robbery and first degree murder are separate offenses. The offenses are found in different sections of the code. First degree murder is an offense against the person, whereas aggravated robbery is an offense against property. However, under the test for separateness found in section 76–1–402(3), aggravated robbery becomes a lesser included offense of first degree felony murder where, in the situation such as the case at bar, the predicate felony for first degree murder is aggravated robbery. No additional facts or separate elements are required to prove aggravated robbery after first degree murder based on the predicate offense of aggravated robbery is shown. Thus, first degree murder based on the predicate offense of aggravated robbery stands in a greater relationship to the lesser included offense of aggravated robbery. If the greater crime is proven, then the lesser crime merges into it. Consequently, U.C.A., 1953, § 76–1–402(3) prevents the defendant from being convicted and sentenced for aggravated robbery in addition to first degree murder where the

aggravating circumstance is aggravated robbery.[3]

The State contends that our opinion in *State v. Baker*, 671 P.2d 152 (Utah 1983), considered and rejected the defendant's argument. In *Baker* we stated:

> The application of § 76–1–402(3)(a) will thus require *some* reference to the statutory elements of the offenses involved in order to determine whether given facts are "required to establish the commission of the offense charged." This requirement that there exist some overlap in the statutory elements of allegedly "included" offenses would prevent the argument that totally unrelated offenses could be deemed included simply because some of the evidence necessary to prove one crime was also necessary to prove the other. For example, evidence proving theft in a trial involving only a charge of first degree homicide would not make theft a lesser included offense under § 76–1–402(3)(a) because none of the statutory elements of theft and homicide overlap.

*Id.* at 158–59 (emphasis in original). The State argues that the relationship between theft and first degree murder discussed in *Baker* is the same as the relationship between aggravated robbery and first degree murder. The problem with this analysis, however, is that theft, unlike aggravated robbery, is not an aggravating circumstance under the first degree murder statute, U.C.A., 1953, § 76–5–202(1)(d). Because we are constrained to depend on the

aggravated robbery conviction to uphold the first degree murder conviction, the aggravated robbery charge merges into the murder charge, and the aggravated robbery conviction must also be vacated.[4]

## VII.

 Lastly, the defendant contends that the evidence was insufficient to convict him of criminal homicide. The defendant contends that the State failed to prove that the defendant had the requisite intent necessary to support a conviction for first degree murder. That claim is entirely without merit. The requisite mental state for first degree murder is "intentionally or knowingly." U.C.A., 1953, § 76–5–202(1). Intent "may be inferred from the actions of the defendant or from surrounding circumstances." *State v. Murphy*, 674 P.2d 1220, 1223 (Utah 1983).

Despite the defendant's testimony that Croasdale died in an accidental shooting during a struggle, there is ample evidence in the record to support the jury's verdict. The evidence presented by the State's expert witnesses regarding the distance of the murder weapon from the victim's forehead substantiated the State's theory that the gun was outside the reach of the victim. In addition, the jury could have inferred that the defendant intentionally killed Croasdale based on the defendant's disposing of the body in a remote area, taking Croasdale's van and other property, and assuming Croasdale's identity in Las

---

**3.** We note that this holding must be carefully read. If the aggravating circumstance or predicate felony for first degree murder is different from an additional offense charged, there may be adequate independent grounds to convict the defendant of both offenses even though they arise out of a single criminal episode. For example, if special verdict forms in this case had indicated that the jury relied on the "pecuniary" or "other personal gain" aggravating circumstances, the defendant could have been convicted of both first degree murder and aggravated robbery. Under that circumstance, aggravated robbery would not be a lesser included offense since the jury would not rely on the same facts to establish the elements of each crime. *See, e.g., State v. Coleman*, 185 Mont. 299, 310–13, 605 P.2d 1000, 1008–10 (1979) (no constitutional or statutory violations for convic-

tions of felony murder, based on the predicate felony of kidnapping, and aggravated kidnapping since each crime required proof of at least one distinct and separate element).

**4.** We note parenthetically that under the peculiar circumstances of this case theft and first degree murder are not totally unrelated offenses as suggested by *Baker*. In this case, the taking of Croasdale's personal property established the crime of theft and provided an element of aggravated robbery and, to the extent that aggravated robbery served as the aggravating circumstance, first degree murder. Thus, under the facts of this case, the statutory element of taking personal property is common to both theft and first degree murder, making theft a lesser included offense of first degree murder.

Vegas and Portland. Similarly, the jury could have reasonably inferred that the defendant intentionally or knowingly killed Croasdale to acquire his property and to assume his identity, thereby avoiding the possibility of being apprehended and returned to Arizona to face probation revocation proceedings.

The defendant's conviction and sentence for first degree murder are affirmed. The convictions for theft and aggravated robbery are set aside.

HALL, C.J., and HOWE and ZIMMERMAN, JJ., concur.

STEWART, Justice (dissenting).

Clearly the evidence establishes that a homicide occurred, but a homicide is not first degree murder unless the defendant shot the victim with the intention of killing him. I submit that the evidence is wholly insufficient to establish that the defendant shot the victim with that intent. The Court summarizes the evidence against the defendant in the following paragraph:

> The evidence presented by the State's expert witnesses regarding the distance of the murder weapon from the victim's forehead substantiated the State's theory that the gun was outside the reach of the victim. In addition, the jury could infer that the defendant intentionally killed Croasdale based on the defendant's disposing of the body in a remote area, taking Croasdale's van and other property, and assuming Croasdale's identity in Las Vegas and Portland. Based on all the evidence, the jury could have reasonably inferred that the defendant intentionally or knowingly killed Croasdale to acquire his property and to assume his identity, thereby avoiding the possibility of being apprehended and returned to Arizona to face probation revocation proceedings.

From this evidence, the jury could only *speculate* that the defendant intended to kill the victim. The evidence showing that defendant disposed of the body in a remote area, took the van and other property, and assumed the victim's identity, shows a con-sciousness of guilt—but a consciousness of guilt consistent with any of several other degrees of homicide. To argue that the State could prove the requisite intent of the crime charged beyond a reasonable doubt on this evidence and whatever other evidence there is in the record (which is virtually none) makes a mockery of the principle that each element of a crime must be proved beyond a reasonable doubt.

The only direct evidence of the shooting came from the defendant who testified that the gun discharged while he and the victim struggled for it after the victim attacked the defendant. Of course, the jury could believe all or part of that testimony. However, that part of the defendant's testimony most favorable to the verdict simply established that the gun was just beyond the victim's immediate grasp at the time it discharged, a fact consistent with the testimony of the medical examiner. The medical examiner testified that the gun was eighteen inches or more from the defendant when it fired. To conclude that the defendant intended to kill the victim from that evidence is sheer speculation. Furthermore, the angle of the bullet's entry was altogether nonprobative of an intentional killing.

The argument that the jury could reach an inference of an intentional killing based on the subsequent acts of the defendant's 1) disposing of the body in a remote area, 2) taking the victim's van and other property, and 3) assuming his identity in Las Vegas and Portland, is not an inference founded in logic but in speculation. One who has committed manslaughter, as well as one who has violated the terms of his parole, is highly likely to act in such a manner. I submit a reasonable person simply could not find beyond a reasonable doubt that the homicide was murder rather than manslaughter. In such a case, our criminal code mandates a finding of the lesser offense. U.C.A., 1953, § 77-17-1. *See State v. Golladay,* 78 Wash.2d 121, 129-30, 470 P.2d 191, 197 (1970), *overruled on other grounds, State v. Arndt,* 87

Wash.2d 374, 378, 553 P.2d 1328, 1330–31 (1976).

Finally, I submit that the trial court erred in the admission of some of the prior criminal acts of the defendant and that that erroneously admitted evidence may have induced the jury to make the finding it did.

In my view, the requirement of proof beyond a reasonable doubt has been reduced to a mere formality in this case. Perhaps the defendant committed first degree murder—one may so speculate. But the evidence does not meet the requisite legal standards to prove it.