**STATE of Utah, Plaintiff and Appellee,**

v.

**William Robert CUMMINS, Defendant and Appellant.**

**No. 900419–CA.**

Court of Appeals of Utah.

Aug. 25, 1992.

Karl R. Johnson and Robert Michael Archuleta, Salt Lake City, for defendant and appellant.

R. Paul Van Dam and Charlene Barlow, Salt Lake City, for plaintiff and appellee.

Before BENCH, BILLINGS and ORME, JJ.

## OPINION

ORME, Judge:

Defendant was convicted of one count of second degree murder, a first degree felony, in violation of Utah Code Ann. § 76-5-203 (1990). On appeal, defendant claims (1) the trial court committed reversible error in failing to remedy several instances of prosecutorial misconduct, and (2) he was deprived of the effective assistance of counsel because his trial attorney, who does not represent him on appeal, failed to timely file notices necessary for the use of psychiatric expert testimony.[1] We affirm in part and remand in part.

## FACTS

In the autumn of 1989, defendant was one of a group of men, employed by the Western Brine Shrimp Company, who resided and worked in a small trailer camp on the northwest shore of the Great Salt Lake. On the evening of October 25, 1989, defendant and several co-workers became ex-

---

1. In his brief, defendant asserts eight separate claims of error. We find only two—the prosecutorial misconduct and ineffective assistance claims—worthy of discussion, and decline to address the other six. *See State v. Carter,* 776 P.2d 886, 888 (Utah 1989); *Northern v. Barnes,* 825 P.2d 696, 699 (Utah App.1992).

tremely intoxicated at the camp, and engaged each other in a series of drunken confrontations involving a variety of weapons. At some point during the evening's bizarre revelry, defendant, in concert with three other employees, allegedly caused the death of co-worker Miguel Ramirez by repeatedly striking him with hands, feet, and a wrench.[2] Defendant was charged with second degree murder. Following a preliminary hearing and bindover by the circuit court, defendant was arraigned on January 2, 1990, and entered a plea of not guilty. Trial was scheduled to begin on February 5, 1990.

During pre-trial preparation of the case, defense counsel apparently decided the best strategy at trial would be to introduce expert psychiatric testimony showing that, because defendant was severely intoxicated when the events in question occurred, he was unable to form any of the possible mental states for second degree murder. Accordingly, on January 16, 1990, defense counsel filed with the trial court a Motion for Appointment of Court Appointed Experts, which included requests for appointment of a blood-alcohol expert and of a psychiatrist, and a Motion to Allow Psychological Testing and Mental Evaluation. On the same day, defense counsel also filed a Notice of Intent to Claim Lack of Capacity to Form Intent, and a Notice of Intent to Call Psychiatric and Other Expert Witnesses.

The trial court held that defendant was prohibited from introducing evidence of his mental state, because his counsel had not filed the two notices within the time limits specified in Utah Code Ann. § 77–14–3 (1990), which provides the time period during which defense counsel must inform the prosecutor of the intent to assert a mental state defense. However, the trial court did grant defendant's request for a blood-alcohol expert. Although his testimony would address defendant's level of intoxication, and its physical and mental effects on defendant, the trial court expressly prohibited the blood-alcohol expert from discussing how such consumption may have diminished defendant's capacity to form intent.[3] In effect, the court found the blood-alcohol expert exempt from the notice requirement of section 77–14–3.

Defendant's attorney called the blood-alcohol expert at trial, and the expert testified that someone of defendant's weight, who had consumed alcohol in the quantity and timeframe claimed by defendant,[4] would probably have achieved a blood-alcohol level between .30% and .40% on the night of the murder, the figure the expert mentioned most frequently being .38%. Prosecution witnesses and the defendant testified as to the great amount of alcohol defendant drank that night, and defendant testified as to his long-term alcoholism. However, since defense counsel was prohibited from offering psychiatric testimony as to the effect such a high blood-alcohol level would have on defendant's capacity to form the requisite mental state for second degree murder, defense counsel was effectively barred from completing his preferred defense.[5] Defense counsel unsuccessfully asserted an alternative theory at trial—that defendant had not participated in the fatal phase of the altercation. Defendant was convicted of second degree murder, and was sentenced to a term of five years to life.

## PROSECUTORIAL MISCONDUCT

Defendant first claims the trial court committed reversible error by failing to

2. A detailed description of the events culminating in Ramirez's death may be found in *State v. Cayer*, 814 P.2d 604 (Utah App.1991).

3. At a hearing on the issue, the trial judge told defense counsel, "As long as you don't get into, in your questioning, the ability to form intent, if you can keep it with judgment is distorted, senses are impaired, something like that, but not the ability as it relates to formation of intent, then I'll allow that."

4. Defendant testified to having consumed four or five ounces of vodka and twenty-five to thirty ounces of whiskey.

5. Given the fact that the trial court effectively eliminated the defense of inability to form the requisite mental states, it is not entirely clear why the blood-alcohol expert's testimony was relevant to the defendant's case. *See* Utah Code Ann. § 76–2–306 (1990) (voluntary intoxication is a defense only if it negates the existence of a requisite mental state).

remedy several instances of prosecutorial misconduct that occurred during the trial. Specifically, defendant points to statements the prosecution made to the jury during closing arguments, and alleges those statements improperly (1) compared the strength of the evidence in this case with that of other cases, (2) misstated the testimony of several witnesses who testified as to defendant's intoxication, (3) personally vouched for the credibility of a prosecution witness, (4) disparaged the defense's strategy of acknowledging the propriety of a conviction on a lesser-included offense, (5) addressed the fact that a co-defendant had been convicted of second degree murder at a separate trial after asserting the same defense as defendant, (6) referred to defendant as a "criminal" and a "liar," and (7) suggested that defendant and a co-defendant had conspired to fabricate a false account of the circumstances surrounding Ramirez's death.

### A. Standard of Review

■■■ This court will reverse on the basis of prosecutorial misconduct only if defendant has shown that

> the actions or remarks of [prosecuting] counsel call to the attention of the jury a matter it would not be justified in considering in determining its verdict and, if so, under the circumstances of the particular case, whether the error is substantial and prejudicial such that there is a reasonable likelihood that, in its absence, there would have been a more favorable result. . . .

*State v. Peters,* 796 P.2d 708, ·712 (Utah App.1990) (quoting *State v. Gardner,* 789 P.2d 273, 287 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990)). In determining whether a given statement constitutes prosecutorial misconduct, the statement must be viewed in light of the totality of the evidence presented at trial. Further, because the trial court is in the best position to determine the impact of a statement upon the proceedings, its rulings on whether the prosecutor's conduct merits a mistrial will not be overturned absent an abuse of discretion. *Gardner,* 789 P.2d at 287.

### B. Claims Properly Preserved For Appeal

■■ Defendant moved for a mistrial immediately after the jury retired to deliberate. He claimed that the prosecution's statements during closing argument that defendant was a criminal [6] and that defendant and a co-defendant, Ray Cabututan, must have manufactured their testimony together [7] were so prejudicial as to warrant a new trial. We think defendant's motion adequately preserved those claims for review. *See, e.g., Gardner,* 789 P.2d at 277, 287 (when defendant, at close of penalty phase of trial, but before jury has returned a sentence, moves for mistrial on grounds of prosecutorial misconduct that occurred during penalty phase, issue of prosecutorial misconduct is preserved for appeal). *Cf. Salt Lake County v. Carlston,* 776 P.2d 653, 655 (Utah App.1989) (when defendant did not challenge jury selection until after return of adverse verdict, objection was not timely made). *But see State v. White,* 577 P.2d 552, 555 (Utah 1978) (objection made after jury retires to deliberate is not timely, as it does not give the trial court an opportunity to rectify any error or impropriety and therefore avoid the necessity of a new trial).

Utah law affords trial attorneys considerable latitude in closing arguments. *State v. Dibello,* 780 P.2d 1221, 1225 (Utah 1989). Counsel for both sides have a "right to discuss fully from their stand-

---

**6.** In closing argument, the prosecuting attorney stated, "Now, as far as [the prosecution witness] being biased, and therefore, he's told you a big lie here because he didn't like [defendant], frankly, some criminals are not liked by everybody."

**7.** The prosecution stated:

> Of course you heard the testimony that was given at the earlier trial by Ray Cabututan. And you heard it of course being read from the witness stand to you. It's interesting to note that his story and this defendant's story mesh fairly well. Why do you think that is? You know, its almost as if maybe they've talked about this and perhaps come up with a story.

points the evidence and the inferences and deductions arising therefrom." *State v. Parsons,* 781 P.2d 1275, 1284 (Utah 1989) (quoting *State v. Lafferty,* 749 P.2d 1239, 1255 (Utah 1988), *cert. denied,* — U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992)). Here, the trial court denied defendant's motion for mistrial on the grounds that the prosecution's characterization of defendant as a "criminal," and its suggestion that defendant had manufactured his testimony in corroboration with Cabututan, were "logically extensions of ... the facts of this case," and "reasonable inference[s]." [8] Thus, the trial court applied the correct standard to its determination of whether the statements were inappropriate, and we do not perceive any abuse of discretion in the court's denial of defendant's motion. *See, e.g., State v. Day,* 815 P.2d 1345, 1350 (Utah.App.1991) (given that counsel are generally afforded considerable latitude during closing arguments, prosecutor's statements did not rise to level of misconduct); *Gardner,* 789 P.2d at 287; *State v. Tillman,* 750 P.2d 546, 555 (Utah 1987). *Cf. State v. Johnson,* 663 P.2d 48, 51 (Utah 1983) (prosecution's statements in closing argument constituted misconduct when they brought to the jury's attention matters the jury would not be justified in considering), *overruled on other grounds, State v. Roberts,* 711 P.2d 235, 237 (Utah 1985); *Walker v. State,* 624 P.2d 687, 691 (Utah 1981) (in closing arguments, prosecution's express reliance on police testimony

the prosecution knew to be false constituted misconduct).

## C. Plain Error

Defendant failed to raise timely objections at trial to any of the other alleged instances of prosecutorial misconduct. However, he claims they are reviewable under Utah R.Evid. 103(d) as "plain error." *See State v. Whittle,* 780 P.2d 819, 821 (Utah 1989) ("[a]bsent a timely objection, we will review an alleged error ... only if it constitutes 'plain error'.") [9]; *State v. Archambeau,* 820 P.2d 920, 922 (Utah App. 1991) (under Rule 103(d), "[a]n appellate court may address a constitutional issue for the first time on appeal if ... the trial court committed 'plain error' ").[10] In *State v. Eldredge,* 773 P.2d 29 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989), the Utah Supreme Court recognized a two-step test for plain error:

> The first requirement for a finding of plain error is that the error be "plain," i.e., from our examination of the record, we must be able to say that it should have been obvious to a trial court that it was committing error.... The second and somewhat interrelated requirement for a finding of plain error is that the error affect the substantial rights of the accused, i.e., that the error be harmful.[11]

*Id.* at 35.

 Defendant's claims do not withstand scrutiny upon careful review of the record, and fail under the first prong of

---

**8.** The court elaborated:
I think the allegation is that he committed a murder, and I interpret the argument as being that for them to find that he is a criminal. As far as [defendant and a co-defendant] getting together [to fabricate their story], they were together the whole night after the incident, had an opportunity to talk about the case. I don't know that there is any evidence that they did so, but certainly that's a reasonable inference for what they were doing with their time during that period of time and in the morning as well before the law enforcement people got there. So I just find that to be a logical—or an argument made from some facts that were before the court, so I will deny the motion.

**9.** *Whittle,* the only Utah case of which we are aware to apply plain error analysis to an allega-

tion of prosecutorial misconduct, dismissed defendant's appeal without discussion. *See* 780 P.2d at 819 (stating only that "we have reviewed the record and the arguments of the parties and come to the firm conclusion that none of the claimed errors rises to the level of 'plain error.' They deserve no further discussion.").

**10.** We note that prosecutorial misconduct claims are generally characterized as due process challenges, and are therefore constitutionally-based. *See, e.g., Medina v. Cook,* 779 P.2d 658, 659 (Utah 1989); *Lafferty,* 749 P.2d at 1254.

**11.** This sentiment has been emphasized in other opinions. *See, e.g., State v. Verde,* 770 P.2d 116, 121–122 (Utah 1989) (equating "plain error" with "manifest injustice").

*Eldredge.* First, given the conflicting testimony adduced at trial, the prosecution's reference to defendant as a liar, while intemperate, only disclosed what the jury could have reasonably inferred from the evidence. *See, e.g., Barnes v. State,* 642 P.2d 1263, 1265–66 (Wyo.1982) (prosecution's characterization of defendant as a "liar" during closing argument does not constitute error when "the evidence discloses a reasonable inference that [defendant] was not truthful in his testimony"). Defendant's claim that the prosecution compared the strength of the evidence against defendant with that of other cases is an overstatement. The prosecution simply emphasized that the evidence in this case had multiple sources and was highly probative of defendant's guilt.[12] Nor do we find any support in the record for defendant's claim that the prosecution misstated witness testimony concerning defendant's intoxication.[13]

 Insofar as defendant claims the prosecution "vouched for the credibility of a prosecution witness,"[14] the prosecution's statements were no more than reasonable inferences based upon the demeanor of the witness and the fact that, before testifying, the witness was required to take an oath of honesty.[15] Finally, the prosecution's remarks concerning the lesser-included offense were essentially correct, and were directed toward helping explain the instructions to the jury.[16] The remarks did not—and, we believe, were not intended to—"disparage the defense" or otherwise impugn the forthrightness of the defense strategy, and therefore did not constitute misconduct. *Cf. Commonwealth v. Gilman,* 470 Pa. 179, 368 A.2d 253, 258 (1977) (prosecutor's reference to the defense's strategy of admitting guilt to a lesser degree of crime as an attempt to " 'becloud the issue,' 'deceive' the jury, and 'sneak out' with a lesser verdict" held to constitute misconduct).

 Finally, during the presentation of defendant's case, portions of the transcript of co-defendant Ray Cabututan's testimony, given by Cabututan at his own murder

---

12. The prosecution stated "its rare that you get a murder with eyewitnesses," a self-evident proposition well within the common understanding of lay jurors, and continued: "You can't get much more than eyewitnesses, physical evidence, and expert testimony, and you've got all three, ladies and gentlemen."

13. Defendant challenges the accuracy of the prosecution's statement that "[defendant] seems to move just fine as far as Eddie's concerned and as far as Richard Anderson's concerned and as far as Eric Tilley's concerned, he's doing just fine.... Everybody who saw him after [drinking] didn't notice any staggering, slurred speech, anything like that." Eddie Apodaca testified that defendant "did not seem quite drunk." Eric Tilley testified that he did not see defendant drinking, and did not equate defendant's behavior with intoxication. While Richard Anderson testified that he felt in danger after defendant became intoxicated, because defendant appeared to be "drunk and dangerous" and "might try to attack our trailer," he said nothing about impaired movement or speech.

14. The challenged statements consist of one in which the prosecutor remarked that the prosecution witnesses "had told you the story the best that they could remember;" another in which the prosecutor stated that "[s]imply because you don't like someone doesn't mean that you would lie about them on the witness stand under oath.

[The witness], on the contrary, seems like the kind of person who liked to try at least to get along with everybody;" and a third in which the prosecutor said "what [the witness] did tell you is what he honestly remembered happening during that fight."

15. Courts generally recognize that, during closing arguments, a prosecutor may comment on the credibility of witnesses. *See, e.g., People v. Constant,* 645 P.2d 843, 846 (Colo.) (en banc) ("[a] prosecutor may draw reasonable inferences as to the demeanor and credibility of witnesses"), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982); *People v. Sanders,* 168 Ill. App.3d 295, 119 Ill.Dec. 53, 59, 522 N.E.2d 715, 721 (1988) ("[c]redibility of a witness is a proper subject for closing argument").

16. The prosecutor stated:

The only difference is some of the lesser includeds lack an element that is in one of the greater charges. Okay? So read the instructions, they'll tell you, you look at murder first, and then only if you find there is a reasonable doubt do you look at a lesser offense. Obviously this defendant would love to be convicted of something less than a second degree murder, so he would like you to look at those [lesser includeds] first, but that's not what the instructions say.

trial, were read to the jury.[17] Immediately prior to the transcript being read, and in the presence of the jury, the prosecution stated that "the State would proffer that the hearing at which this testimony was given was the trial of Mr. Cabututan. He was in fact convicted of murder in the second degree at that time." The statements were accurate, went unchallenged, and—our reading of the record suggests— might have been made pursuant to prior stipulation. Then, during closing arguments, the prosecutor asked the jury:

Why should we believe the eyewitnesses over the defendant and [co-defendant] Mr. Cabututan? In the instructions, the judge told you that you can take into consideration of course the witness' interest in the case.... What interest did Mr. Cabututan have? He had the same interest in lying as did this defendant.... Remember, Mr. Cabututan was convicted of second degree murder.

Defendant failed to object to either the proffer or the closing argument. He now claims the references to Cabututan's conviction rise to the level of plain error.

In response, the State asserts the prosecution's statements were properly admitted under Utah R.Evid. 609(a). Rule 609(a) permits impeachment of a witness's credibility through introduction of evidence that the witness has been convicted of (1) a felony, or (2) a crime involving dishonesty or false statement. The rule equates the commission of certain crimes with dishonesty or general untrustworthiness, and manifests a policy that, when judging a witness's credibility, juries should be aware of the fact that the witness has committed illegal acts of certain types. In the instant case, Cabututan's second degree murder conviction clearly falls within the ambit of Rule 609(a)(1).

Rule 609(a)(1) places one limitation on the introduction of otherwise admissible conviction evidence: Before a felony conviction will be admitted for impeachment purposes, the court must determine that "the probative value of admitting the evidence outweighs its prejudicial effect."[18] *State v. Banner*, 717 P.2d 1325, 1334 (Utah 1986) (quoting Utah R.Evid. 609(a)(1)). *Accord State v. Gentry*, 747 P.2d 1032, 1036 (Utah 1987); *State v. Morrell*, 803 P.2d 292, 295 n. 3 (Utah App.1990). Factors a court should consider when weighing the probative value of conviction evidence against its prejudicial effect "have been summarized ·to include" the nature of the crime; the recentness of the conviction; the similarity of the prior crime to the one now charged; the importance of credibility issues; and, when the witness to be impeached is the defendant, whether the importance of the accused's testimony warrants the exclusion of convictions probative of the accused's character for veracity. *Banner*, 717 P.2d at 1334. If, after performing the necessary balancing exercise, the court determines that the evidence's probative value outweighs its potential to prejudice the defendant, the conviction may properly be introduced.

---

**17.** Cabututan was not called as a witness because he had repeatedly informed his attorney that, if he were called, he would invoke his Fifth Amendment right against self-incrimination. The trial court, regarding Cabututan as an "unavailable" witness in accordance with Utah Rule of Evidence 804(a)(2), permitted portions of the transcript of Cabututan's testimony to be read into the record.

**18.** Such prejudice typically arises when the defendant is the witness, and the prosecution attempts to impeach the defendant's testimony through introduction of evidence that defendant has been convicted of a crime similar to the one for which he is presently charged. The concern is that, because such evidence demonstrates the defendant's ability to commit, and experience in committing, the type of offense for which he is on trial, the jury may improperly infer that defendant is probably also guilty in the instant case. *See, e.g., State v. Gentry*, 747 P.2d 1032, 1037 (Utah 1987); *State v. Banner*, 717 P.2d 1325, 1335 (Utah 1986). While the Rules of Evidence adopted by this state generally apply equally to all witnesses, *see Terry v. Zions Coop. Mercantile Inst.*, 605 P.2d 314, 325 n. 40 (Utah 1979), it is well accepted that the potential for prejudice from admission of conviction evidence is greater when the witness is a testifying defendant, than when the witness is a third party. *See Banner*, 717 P.2d at 1334 n. 44 ("[c]onsideration of the testimony's prejudicial effect is especially pertinent when the witness is the defendant in a criminal prosecution....").

In the instant case, the prosecution's statements that Cabututan had been convicted of the same offense as the one charged to defendant clearly possessed some potential for prejudice,[19] since the statements could have bolstered the improper inference that because Cabututan had been convicted, defendant should also be found guilty of a crime arising from the same events.[20] However, given the state of the evidence, there is also a distinct possibility that the defendant could have *benefitted* from the jury's knowledge of the fact that Cabututan had been convicted. Eyewitnesses to Ramirez's death gave somewhat inconsistent testimony concerning the identity of the men involved in the fatal beating, and defendant testified that while he had fought briefly with Ramirez several hours prior to his death, he had not participated in the fatal beating. To the contrary, defendant claimed he had attempted to protect Ramirez from attack and had helped Ramirez to his trailer after the beating had occurred. Further, in both opening and closing remarks, defense counsel emphasized that Cabututan had participated in the fatal beating and, indeed, was the main culprit.[21] Given these facts it is entirely possible that, rather than bolstering an inference of defendant's guilt, Cabututan's murder conviction may have tended to suggest that someone other than defendant was responsible for Ramirez's death, and justice had been fully served by Cabututan's conviction. Alternatively, much of the defense's strategy was geared at convincing the jury to convict defendant either of manslaughter or negligent homicide. Since the evidence suggested that Cabututan had played a qualitatively larger role in the violence than had defendant, Cabututan's conviction for murder provided a convenient backdrop for arguing that defendant should be convicted of something less than murder.

Insofar as defendant claims the prosecutor's statements were inadmissible, he essentially argues that the prejudicial effect of the statements outweighed their probative value. *See* Utah R.Evid. 609(a)(1). However, we are not convinced that the jury's knowledge of Cabututan's conviction posed any threat to defendant's trial strategy. Given defense counsel's repeated references to Cabututan's violent acts, and apparent desire to paint Cabututan as the most heinous of Ramirez's attackers, the prosecution's statements appear more likely to have furthered defendant's case than to have prejudiced it. Indeed, defense counsel himself referred to Cabututan's conviction in closing arguments [22]—an act wholly inconsistent with the actions of one anxious to keep such information from the jury.

**19.** Cabututan's alleged involvement in the fatal beating would not have been news to the jury—several witnesses at defendant's trial had testified to his involvement. That he was charged and convicted after employing the same defense and giving the same testimony as defendant, however, came only from the prosecutor.

**20.** Defendant also claims as error the prosecution's statement that defendant and Cabututan both asserted theories of self-defense, when in actuality defendant's theory was based on his testimony that he had not, for the most part, been present during the fatal phase of the altercation, and that to the extent he had been, he was actually trying to help Ramirez. We agree with defendant that the remark was a misstatement of evidence. However, given that the prosecuting attorney made this misstatement only once, and later corrected himself, and in light of the fact that the jury heard all of the defense's evidence in this case, none of which referred to self-defense, we find it highly unlikely that the jury could have been misled or confused by the misstatement to any significant degree. *See State v. Cude,* 784 P.2d 1197, 1201 (Utah 1989) (a misstatement of evidence may constitute prosecutorial misconduct if it "affects the substantial rights of a party") (quoting Utah R.Crim.P. 30(a)).

**21.** In closing argument, defendant's attorney stated:

[I]t seems to me the significant thing [in Cabututan's testimony] is [Cabututan] says "Boy, I had a ten-inch crescent wrench, and I whopped that guy at least I think three times" he says. . . . I can't see why he would have any reason to say that, its a trial for murder in the second degree of which he was convicted, unless its true. . . . Seems to me if [defendant fought with Ramirez], he clearly did [so] not knowing that later on, Ray Cabututan was going to basically kill this guy with a wrench and with his kicking.

**22.** *See* note 21.

■ The court's deliberations concerning the propriety and prejudice of the prosecutor's statements cannot be conducted in a vacuum. Rather, its balancing exercise must be conducted in light of the realities of the proceedings, and must take into account each party's strategy and theory of the case. Certainly, the *Banner* factors are crucial to a court's determination of admissibility. However, when factors additional to those listed in *Banner* become relevant to the balancing process, the court errs if it does not consider those factors. *See Banner,* 717 P.2d at 1334 (claiming only that the factors a court must consider "have been summarized to include" the five listed in that opinion). In the instant case it would have been reasonable for the court, observing defense counsel's apparent desire to capitalize on the jury's knowledge of Cabututan's conviction, to refrain from independently taking issue with the prosecutor's statements on the ground that, given defense counsel's trial strategy, the statements' potential for prejudice was more than counterbalanced by the potential benefit to defendant.

After taking into consideration the state of the evidence and defense counsel's apparent strategy in this case, we cannot say that "it should have been obvious to [the] trial court that it was committing error" in failing to independently act to mitigate the effects of the prosecution's actions challenged for the first time on appeal. *Eldredge,* 773 P.2d at 35. Accordingly, the statements did not rise to the level of plain error.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also claims his trial attorney's failure to timely file the statutorily required notice of intention to offer the testimony of a mental health expert constituted ineffective assistance of counsel. We now consider that issue.

### A. Applicable Statutory Provisions

Utah Code Ann. § 76-2-306 (1990) states, in relevant part, that "voluntary intoxication shall not be a defense to a criminal charge unless such intoxication negates the existence of the mental state which is an element of the offense." Therefore, in developing a defense strategy around defendant's voluntary intoxication on the night of the murder, defense counsel was statutorily limited to showing that the alcohol deprived defendant of the capacity to form the mental state necessary for second-degree murder. Unless defense counsel could make that precise showing, evidence of defendant's excessive intoxication would be wholly counterproductive.[23]

Utah Code Ann. § 77-14-3 (1990) provides in part:

(1) When a defendant proposes to offer evidence that he is not guilty as a result of insanity or that he had diminished mental capacity or any other testimony of a mental health expert to establish mental state, he shall, at the time of arraignment or as soon afterward as practicable, but no fewer than 30 days before the trial, file and serve the prosecuting attorney with written notice of his intention to claim the defense.

. . . .

(3) If the defendant fails to meet the requirements of Subsection (1), he may not introduce evidence tending to establish the defense unless the court for good cause shown otherwise orders.

The trial court found the voluntary intoxication provisions of section 76-2-306 to be subject to the notice requirement of section 77-14-3. The correctness of its decision in this regard is not challenged.[24] From all

---

**23.** Unless the requisite mental state were vitiated, evidence of defendant's extreme intoxication would only detract from his credibility as a witness, and render his recollection of the events of the night in question less reliable than it might otherwise be.

**24.** The trial court's interpretation of the relationship between the two statutes appears correct. It is clear that appropriate testimony showing that defendant's intoxication "negate[ed] the existence of the mental state which is an element of the offense" would be a form of evidence bearing on "diminished mental capacity" or "establish[ing] mental state." *See, e.g., State v. Johnson,* 784 P.2d 1135, 1139 (Utah 1989); *State v. Padilla,* 776 P.2d 1329, 1331-32

that appears, defense counsel was obligated to comply with the terms of section 77–14–3 before introducing psychiatric testimony concerning the effect defendant's severe intoxication had on his ability to form any of the mental states required for second degree murder.

## B. Analysis

▇▇▇▇ To successfully assert a claim of ineffective assistance of counsel, defendant must show that (1) his counsel's performance was objectively deficient, and (2) there exists a reasonable probability that, absent the deficient conduct, the verdict would have been more favorable to defendant. *See, e.g., State v. Frame,* 723 P.2d 401, 405 (Utah 1986); *State v. Moritzsky,* 771 P.2d 688, 690 (Utah App.1989). In the instant case, defendant's trial counsel was appointed on October 27, 1989—over two months before arraignment and over three months before trial—yet he did not file notice of his intent to assert a defense of diminished capacity until January 16, 1990, two full weeks following arraignment and about twenty days prior to trial. Given the amount of time counsel had to formulate his theory of defense, the absence in the record of any explanation for his inability to comply with the statute, and the lack of any trial strategy likely to be served by missing an important deadline, we believe defense counsel's failure to comply with the notice requirement of section 77–14–3 constituted conduct "outside the wide range of professionally competent assistance," and was therefore objectively deficient. *State v. Frame,* 723 P.2d 401, 405 (Utah 1986).

▇▇▇▇ The second element—whether counsel's deficient performance prejudiced defendant's trial—requires a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial."

*State v. Montes,* 804 P.2d 543, 545 (Utah App.1991) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). To satisfy this burden, it is not enough that defense counsel erred and defendant's trial reached an unfavorable result. *Frame,* 723 P.2d at 405 ("an unfavorable result does not compel a conclusion of ineffective assistance of counsel"). Instead, defendant must demonstrate that, absent counsel's errors, there exists a "reasonable probability" the jury would have reached a different verdict. *Id.; State v. Pursifell,* 746 P.2d 270, 275 (Utah App.1987).

In this case, the record indicates the defense of inability to form any of the requisite mental states clearly would have provided defendant with a better chance for acquittal than the theory actually asserted at trial. Given the testimony of prosecution witnesses, defendant's account that he was not involved in the fatal beating— which account was supported only by Cabututan, whose testimony was merely read to the jury—had little chance of success. We recognize that the intoxication defense was by no means certain to result in an acquittal; however, it appears to have been the best defense available to defendant. To lose that defense, which was the upshot of counsel's tardy filing of the notice required by section 77–14–3, may well have impacted upon "the fundamental fairness of the proceeding challenged," *Frame,* 723 P.2d at 405, given the expert testimony setting defendant's possible blood alcohol level as high as .38%.[25]

▇▇▇▇ Ordinarily, when the trial record is inadequate to permit a determination that defendant's case has clearly been prejudiced by defense counsel's deficient performance at trial, defendant is precluded from raising his ineffective assistance claim on

(Utah 1989) (discussing proper jury instruction for defense of diminished capacity).

**25.** It may be noted that blood alcohol levels exceeding .30% generally cause marked muscular incoordination, convulsions, sensory loss, and/or stupor, while levels of .50% or greater usually result in coma or death. *See, e.g.,* Robert H. Dreisbach, M.D., Ph.D. & William O.

Robertson, M.D., Handbook of Poisoning: Prevention, Diagnosis & Treatment 171 (12th ed. 1987); Massachusetts Poison Control System, 4 Clinical Toxicology Review 1 (November 1981). However, chronic alcoholics tolerate higher levels with fewer observable manifestations of intoxications than do adult non-alcoholics or children. 4 Clinical Toxicology Review at 1.

appeal and must seek relief through post-conviction or habeas corpus proceedings. *State v. Humphries,* 818 P.2d 1027, 1029 (Utah 1991). *Accord State v. Johnson,* 823 P.2d 484, 487 (Utah App.1991). In the instant case, we do not possess the information necessary to make an informed determination of whether prejudice occurred. Since the psychiatric expert never testified at trial, we have no evidence upon which to base a decision concerning the testimony's likely value to defendant, i.e., the extent to which defendant was prejudiced by the absence of the testimony. Thus, under *Humphries* and its progeny we would decline to reach defendant's ineffective assistance claim.

Rigid application of *Humphries,* however, while promoting uniformity of procedure, does so at the expense of efficiency and practicality. Where, as here, the missing information consists of the testimony of a single intended witness, it seems untenable for this court to invest significant time in reviewing the parties' briefs, studying the voluminous trial record, and performing other necessary research, only to wash our hands of the affair when we determine that one small but crucial piece of evidence is missing from the record. This is especially true when one considers that, upon our refusal to consider the issue, defendant will most likely raise the same argument anew in a district court habeas corpus or post-conviction proceeding, the decision in which could well be appealed, necessitating a second and duplicative round of review of briefs, study of the record, and research.

A much more sensible approach is for this court to remand for a limited evidentiary hearing, at which time the nec-

essary evidence can be adduced and the issue of prejudice resolved. Indeed, new Utah Rule of Appellate Procedure 23B encourages such a procedure, by expressly providing for motions for remand to the trial court to enter findings relevant to ineffective assistance claims.[26] Thus, we believe that a limited remand to the trial court for an evidentiary hearing is appropriate in this case to determine the substance of the psychiatric expert's testimony. Accordingly, we remand this case to the trial court with directions to hear the testimony of defendant's excluded mental health expert and to determine whether defendant was prejudiced by the absence of the expert's testimony at trial. If the trial court determines that its exclusion of the testimony did indeed prejudice defendant's case to the extent that the outcome might well have been more favorable had the psychiatrist testified, a new trial will be necessary.[27]

## CONCLUSION

The prosecution's challenged remarks which were timely objected to did not constitute prosecutorial misconduct; the remarks which were not objected to did not rise to the level of plain error. However, trial counsel's performance in failing to timely file notice of his intention to develop a mental state defense was objectively deficient; we remand for a determination of prejudice.

BILLINGS, J., concurs.

BENCH, J., concurs in result.

26. Rule 23B becomes effective on September 1, 1992.

27. Before ruling on the State's request that defendant be barred from introducing psychiatric testimony for failure to comply with section 77–14–3, the trial court should have first considered whether exclusion of the testimony might prejudice defendant's case. Since, in this case, the psychiatric testimony was crucial to presentation of defendant's optimal—and only plausible—theory of defense, the *potential* for prejudice as a result of the testimony's exclusion was clear. Thus, the court should have permitted

defendant to introduce the psychiatric testimony under section 77–14–3(3) "for good cause shown," despite defense counsel's failure to timely file notice. If the prosecution claimed the dilatory notice had given it insufficient time to prepare, the court could then have granted a continuance. Such a procedure would have both safeguarded defendant's right to a fair trial and maintained the overall fairness of the proceedings, while avoiding the judicial inefficiencies that have become necessary due to the exclusion of the psychiatric testimony.