**STATE of Utah, Plaintiff and Appellee,**

v.

**Betty BASTA, Defendant and Appellant.**

**No. 961507–CA.**

Court of Appeals of Utah.

Sept. 17, 1998.

Richard G. Uday, Salt Lake City, for Defendant and Appellant.

Jan Graham, Atty. Gen., and Kris C. Leonard, Ass't. Atty. Gen., Criminal Appeals Div., Salt Lake City, for Plaintiff and Appellee.

Before WILKINS, Associate P.J., and BENCH and BILLINGS, JJ.

## OPINION

WILKINS, Associate Presiding Judge:

Defendant Betty Basta appeals from jury convictions of aggravated arson, a first degree felony in violation of Utah Code Ann. § 76–6–103 (1995), and insurance fraud, a second degree felony in violation of Utah Code Ann. § 76–6–521 (1995). We affirm.

## BACKGROUND

"In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict," *State v. Dunn*, 850 P.2d 1201, 1205–06 (Utah 1993), and recite the facts of this case accordingly. We "present conflicting evidence only to the extent necessary to un-

derstand the issues raised on appeal." *Id.* at 1206.

On February 6, 1995, defendant, who handled her family's finances, applied for full coverage insurance on the house in which they lived on Peachblossom Drive in Sandy, Utah.[1] Defendant's family had been enduring substantial financial hardships for several years, and just ten days before defendant applied for insurance, defendant's family was served with a three-day eviction notice.

The Peachblossom Drive home was a split-level home. On Friday, February 10, 1995, around 2:30 p.m., defendant's husband discovered a small fire in a closet on the home's lower level under the stairs. Defendant's husband extinguished the fire himself by spraying the fire with water through a garden hose he attached to a fire hydrant. Defendant's husband then moved the items that had been damaged by the fire out of the closet and into the backyard. He did not call the fire department.

The next morning, at 9:37 a.m., a fire crew was dispatched to fight an active fire in the Peachblossom Drive home. Before they arrived at the home, firefighters could see a heavy plume of smoke caused by fire blowing out of the home's front windows. Two crews went through the front doors with hoses. One crew headed upstairs. The other crew, led by their battalion chief, David Durrant, went downstairs to the home's lower level.

Durrant manned the nozzle of his crew's hose. He and his crew faced flames and blinding smoke. Durrant reached the bottom of the stairs, shooting bursts of water in front of him in order to see the next few steps. Upon reaching the bottom level, he discovered that the bulk of flame was to his left. Durrant saw fire burning in a closet under the stairs, so he turned his hose on that area only to find that the closet fire was a quick, hot fire which was instantly knocked down when Durrant hit it with some water. Durrant discovered that the fire's heart was

four to eight feet into the family room, which shared a common wall with the closet.

Unlike the fire in the closet, the family room fire took twenty to thirty minutes of hard fighting before the firefighters could claim any kind of control over it. In the family room, the crew put out fire that was burning on several cardboard boxes on the floor in the middle of the room. Durrant also noted numerous other cardboard boxes around the room's perimeter. Defendant's husband later explained that the family room was full of boxes because it had been used as a storage room.

Once the fire was extinguished, Durrant took time to examine the scene, primarily for safety reasons. Among his observations, Durrant noted that the studs in the closet had started scorching but "were not really far involved," and that the stairs which formed the closet ceiling "were very solid" and had not been structurally undermined by the closet fire. Based on his experience with the fire and his observations following it, Durrant determined that the fire burned from the family room toward the closet and stairwell.

Around 10:30 a.m. Sandy City Fire Marshal Dave Meldrum arrived on the scene to investigate the fire's cause and origin. In doing so, Meldrum was trained to assume that the fire was accidental by examining all possible accidental causes. Meldrum noted that most of the fire damage was in the downstairs family room. However, one-half hour into his investigation, he was told of the fire that had occurred in the downstairs closet the previous afternoon.

With this information in mind, Meldrum concentrated on the closet, thinking that the Friday closet fire had rekindled to cause the Saturday fire. He looked at the items burned in the Friday fire and determined that the fire had been small. He examined the closet carefully, noting that there were still items in the closet that were unburned

---

1. Defendant's family had lived in the home for twenty years. The home had been theirs until a few years before the fire, when they faced losing it because they had not been able to make their house payments for some time. Defendant's family entered into an agreement with a third party, who then bought their home and allowed them to lease the home with an option to purchase. Defendant's family was required to make monthly rental payments, continue remodeling the home's basement, and maintain insurance on the home.

which would likely have been totally consumed if the Saturday fire had started in the closet. Meldrum also noted that the stairwell was not as damaged as he would have expected had the Saturday fire started in the closet.

Meldrum also examined the electrical system that had been affected by the fire. As part of this examination, Meldrum removed part of the wiring from the common wall between the closet and family room to more closely examine it. However, Meldrum ultimately eliminated electricity as the fire's cause, in part because he found the wiring to be pliable instead of brittle, as it would have been had it caused the fire, and because he saw nothing in the wiring to be inconsistent with having simply been exposed to the heat and flames which burned around it.

Ultimately, Meldrum eliminated all possible accidental causes and concluded that the fire was intentionally set. He determined the fire originated between three and five feet from the wall the family room shared with the closet. Meldrum concluded the fire was probably caused by a flame intentionally applied to items stored in the family room. He determined that the fire traveled, in part, from its area of origin in the family room through the family room door into the hallway, and then it attacked the closet door.

After Meldrum's investigation, the wiring Meldrum had removed from the closet for examination disappeared. As a result, no other investigators were able to examine the wiring. However, later investigators were able to examine over a dozen pictures of the wiring that Meldrum had taken during his investigation.

A second investigator, Jerry Thompson, sent by United States Fidelity and Guaranty Insurance, arrived to investigate the fire scene on February 14, 1995. Thompson admitted that his job was difficult because time had passed, windows had been boarded up, and the fire department had completed its work on the site. However, Thompson said these obstacles did not make his job impossible. In Thompson's opinion, significant evidence still existed, which he examined over several days. Thompson concluded the fire had been intentionally set and had started near the front of the downstairs family room. He also concluded that the fire in the downstairs closet had been small, noting that there was very little burn in the closet, except at the top. Thompson completed his own review of the fire scene before he talked to Meldrum or any of the fire department personnel.

A third investigator, Donald Peak, sent by CNA Insurance Company, arrived to investigate the fire scene on February 18, 1995. Like Thompson, Peak did not speak to Meldrum or other fire department personnel until after he independently evaluated the scene. Peak concluded the fire started in about the center of the downstairs family room, from where it burned into the hallway and then entered the closet by burning into the closed closet door from the top. Peak also concluded the fire had been intentionally set.

After these investigations occurred, a demolition crew gutted and remodeled the home. The crew worked on the home, particularly the home's lower level, on April 4, 5, 6, 7, and 19 of 1995. Their work materially altered the fire scene.

Defendant was formally charged on April 6, 1995, and was appointed counsel on April 11, 1995. By April 11, the work crew had finished their demolition work on the Peachblossom Drive house. In addition, the majority of the home's lower level had been reframed, rewired, and remodeled.

After entering his appearance, defendant's counsel filed a request for discovery. Defendant's counsel specifically requested exculpatory information, witness lists, and any plea bargain agreements provided to any prosecution witnesses.

On April 26, 1995, fire marshal Meldrum stole a trailer. The next month, Meldrum was arrested for the theft, and because of the theft, was dismissed as Sandy City Fire Marshal. The prosecutor did not notify defendant's counsel of Meldrum's arrest. However, that same month, defendant read a newspaper story indicating that Meldrum had been discharged as fire marshal because of the criminal case. Defendant's counsel then cross-examined Meldrum about the

criminal charges at the June preliminary hearing.

In July 1995, Meldrum appeared in court on the felony theft charge. Under a plea agreement with the State, Meldrum pleaded "no contest" to an amended charge of attempted theft of a trailer, a misdemeanor. The judge accepted Meldrum's plea and ordered that it be held in abeyance for one year. Under the parties' agreement, the court would dismiss Meldrum's case after one year if Meldrum paid $150.00 in court costs and the court determined Meldrum had demonstrated "good behavior," which included no further legal violations during that time.

Before trial, defendant's counsel told the prosecutor he planned to use what he knew about Meldrum's criminal case to impeach Meldrum at trial. The prosecutor never told defendant's counsel of Meldrum's plea bargain or that the plea had been held in abeyance for a year. Nevertheless, defendant's counsel extensively cross-examined Meldrum regarding his plea agreement at trial. In response to defendant's counsel's questions, Meldrum testified that there was no relationship between his plea agreement and his testimony that Basta intentionally set the fire.

David Smith, a certified fire investigator, testified for defendant. Because the fire scene had been substantially altered when defendant contacted him, Smith had been unable to examine it. Instead, Smith based his testimony on photographs others had taken of the fire scene. Smith testified that the fire was accidental and was started either by unextinguished embers of the Friday fire or by shorts in the wiring. Because the wiring removed by Meldrum had disappeared, Smith was not able to examine it; however, he testified regarding the wiring from the pictures Meldrum had taken.

After the testimony was given and defendant's counsel had presented his closing argument, the prosecutor gave his closing argument. As part of those remarks, the prosecutor argued Smith's testimony was not credible because Smith had not conducted an on-the-scene fire investigation. The prosecutor also addressed attacks defendant's counsel had made during his closing argument on Meldrum's credibility.

The jury found defendant guilty of aggravated arson and insurance fraud. After the trial, defendant's counsel subpoenaed the tape of Meldrum's criminal plea proceeding.

Defendant now appeals.

## ANALYSIS

Defendant develops two main arguments on appeal. First, defendant contends she should be granted a new trial because of improper conduct that occurred regarding Meldrum's plea agreement. Second, defendant alleges she was unfairly prejudiced by her expert's inability to personally examine the wiring Meldrum had removed from the downstairs closet wall, which was later lost. Defendant also argues that the combination of these errors constitutes cumulative error and requires a new trial. We begin by addressing defendant's first argument.

### A. Meldrum's Plea Agreement

Defendant argues she should be granted a new trial because of three incidents of improper conduct pertaining to Meldrum's plea agreement. First, defendant contends the prosecutor committed a discovery violation because he improperly failed to disclose Meldrum's plea agreement. Second, defendant asserts Meldrum falsely testified regarding his plea agreement during defendant's counsel's cross-examination of Meldrum. That false testimony, defendant argues, constituted perjury and warrants a new trial. Third, defendant argues that in his closing remarks, the prosecutor improperly bolstered Meldrum's perjured testimony by making inappropriate statements about Meldrum's credibility.[2] We first ad-

---

**2.** Defendant cites to both the United States and Utah Constitutions in framing her argument that the improper conduct pertaining to Meldrum's plea agreement denied her of her rights to due process and a fair trial. However, defendant does not separately argue or analyze her arguments under the Utah Constitution. We therefore do not address defendant's arguments under the Utah Constitution. *See State v. Horton,* 848 P.2d 708, 710–11 (Utah Ct.App.1993) ("Mere al-

dress defendant's discovery violation argument.

### 1. Discovery Violation Argument

█ Defendant contends the prosecutor committed a discovery violation because he failed to inform defendant of Meldrum's crime, arrest, and plea agreement. The State does not dispute this contention, and we therefore accept it. However, for us to reverse defendant's conviction based on the prosecutor's discovery violation, we must conclude that violation "resulted in prejudice sufficient to warrant reversal under Rule 30" of the Utah Rules of Criminal Procedure. *State v. Knight,* 734 P.2d 913, 919 (Utah 1987); *accord State v. Grueber,* 776 P.2d 70, 75 (Utah Ct.App.1989).

Rule 30 states, "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." Utah R.Crim. P. 30(a). The Utah Supreme Court has explained that when an error has occurred in a criminal trial, this rule requires reversal only if "the likelihood of a different outcome [is] sufficiently high to undermine confidence in the verdict." *Knight,* 734 P.2d at 920; *accord State v. Mickelson,* 848 P.2d 677, 691 (Utah Ct.App. 1992); *Grueber,* 776 P.2d at 75–76. In other words, the reviewing court must determine "whether there is a reasonable likelihood that the outcome of [the defendant's] trial would have been more favorable to him [or her] had" the error not occurred. *Knight,* 734 P.2d at 920. We thus examine whether the outcome of defendant's trial would have been more favorable to her had the prosecution revealed Meldrum's crime, arrest, and plea agreement.

Defendant argues that Meldrum's credibility was central to the prosecution's case and that because the prosecutor failed to tell defendant of Meldrum's crime, arrest, and plea agreement, the jury was not able to accurately evaluate Meldrum's credibility. Defendant argues that Meldrum's credibility

was vital to the State's case because Meldrum was the only witness who was able to personally inspect the wiring in the downstairs closet wall and the breaker panel's condition. Further, defendant explains, Meldrum was the first trained investigator who examined the fire scene.

However, defendant fails to show that a reasonable likelihood exists that without the prosecutor's discovery violation the result of the trial would have been more favorable to defendant. Defendant does not explain either how the trial would have been conducted differently had the prosecutor given defendant the information about Meldrum or how that information would have significantly affected the jury's evaluation of Meldrum and the final verdict than what the jury was actually told at trial. Instead, defendant simply argues that Meldrum's credibility was central to the State's case and material to the issue of guilt or innocence.

Defendant's failure to demonstrate that a reasonable likelihood exists that without the prosecutor's discovery violation she would have received a better result at trial is especially troubling because of certain facts the record reveals. For example, the record reveals that at trial, defendant and her counsel were aware of Meldrum's crime, arrest, and plea agreement. At trial, defendant's counsel did, several times, attack Meldrum's credibility based on his crime, arrest, and plea agreement. In particular, in his extensive cross-examination of Meldrum, defendant's counsel in great detail questioned Meldrum about his theft of the trailer, the potential punishment Meldrum faced for his crime, the plea agreement Meldrum reached with the prosecutor, and the benefits Meldrum received from that plea agreement. In the course of this questioning, defendant's counsel called to the jury's attention that Meldrum had committed a felony, lied about it to the police, produced forged documents to hide his crime, and then reached a plea

---

lusion to state constitutional claims, unsupported by meaningful analysis, does not permit appellate review."). Furthermore, although she cites to it in her argument, defendant does not explain how the Sixth Amendment to the United States Constitution was violated. We therefore do not ad-

dress defendant's arguments under the Sixth Amendment. *See State v. Vigil,* 922 P.2d 15, 25 (Utah Ct.App.1996) ("It is well settled that an appellate court is not ' "a depository in which an appealing party may dump the burden of argument and research." ' " (citations omitted)).

agreement. Defendant's counsel again attacked Meldrum's credibility, based on his crime and plea agreement, in his closing remarks to the jury. The jury thus knew of Meldrum's dishonest and illegal acts and that he had reached a favorable plea agreement with the State while the State was preparing to prosecute defendant.[3]

Because defendant fails to demonstrate that a reasonable likelihood exists that without the prosecutor's discovery violation the trial result would have been more favorable to defendant, and in light of the fact that defendant and her counsel knew of Meldrum's crime, arrest, and plea agreement and addressed them at trial, we reject defendant's argument that the discovery violation warrants a new trial.

3. Further, the record reveals that Meldrum's conclusions regarding the fire's cause and origin did not change after he examined the fire scene in February, over two months before he stole the trailer. In addition, Meldrum was not the only expert to examine the fire scene who concluded the fire originated in the family room and had been intentionally set. Both Thompson and Peak, who independently investigated the fire scene, arrived at those same conclusions. Moreover, Durrant, the firefighter who fought the fire and examined the scene immediately after extinguishing the fire, also concluded the fire had originated in the family room. However, defendant does not address these facts in arguing that the discovery violation requires that she receive a new trial.

4. The relevant portion of the trial transcript that recites defendant's counsel's cross-examination of Meldrum reads as follows:

Q. When you testified against Betty at the preliminary hearing, you hadn't had this deal yet; isn't that right?
A. That's right.
Q. They hadn't extended this offer to you?
A. No.
Q. You knew if you testified against her in a way that would help the State make its case, that you might receive some favorable treatment, such as this deal from the District Attorney's office; isn't that right?
A. Counsel, that's ludicrous.
Q. It's ludicrous?
A. It's offensive.
. . . .
Q. In your case, you were charged with the third-degree felony; isn't that right?
A. Yes.
Q. Clearly, Mr. Meldrum, you could have been charged with other counts; isn't that correct?

## 2. Perjury Argument

■ Defendant also argues we should grant her a new trial because Meldrum committed perjury by falsely testifying about his plea agreement during the cross-examination of him by defendant's counsel. In that exchange, Meldrum stated that he did not testify for the State at the preliminary hearing out of the belief that he would receive a favorable plea bargain in the theft case, that he was not required by the terms of the plea bargain to cooperate with the State to ensure that the theft charge was ultimately dismissed, and that he did not perceive any connection between the plea agreement and his trial testimony.[4]

Defendant has not provided us with any evidence that contradicts any of these state-

A. I don't think so.
. . . .
Q. You wouldn't want those charges [of tampering with evidence and giving false information to a police officer] to be filed against you now?
. . . .
A. No.
. . . .
Q. Isn't it true that you're testifying against Ms. Basta to make sure that something like that doesn't happen in this particular case?
A. Of course that's not true. Again, that's really offensive.
Q. Your plea has been held in abeyance for a year?
A. Yes.
Q. The plea can be dismissed?
A. Yes.
Q. You're to cooperate with the State as part of your plea to make sure that the charges are dismissed?
A. Absolutely not.
Q. It's not true?
A. Absolutely not true.
Q. You see no connection between the deal that you were offered and your testimony in this case, Mr. Meldrum?
A. Your question was whether or not part of the deal was that I was to cooperate with the State.
Q. Do you see any connection Mr. Meldrum—
A. I do not.
Q. —between your testimony in this case and the deal that you received?
A. None whatsoever.
Q. Do you see any connection, Mr. Meldrum, in respect to your testimony in this case and the charges against you being dismissed outright?
A. Absolutely not.

ments. First, nothing in the record supports defendant's speculative contention that Meldrum's pretrial testimony was given in the hopes of obtaining a favorable plea agreement. On the contrary, the record reveals that Meldrum never asked the prosecution for favorable treatment.

Second, despite Basta's statement that the transcript of the plea agreement "clearly indicate[s] that [the State] intended to use Meldrum in other cases and offered the plea bargain in an effort to secure his cooperation," the record does not support this statement either.[5] The plea transcript instead only establishes that the prosecutor wanted to have the no contest plea entered in the theft case because Meldrum was scheduled to be a witness in future felony cases and the State was concerned about attempts to impeach Meldrum. The plea transcript does not support defendant's suggestion that the State offered the plea agreement to insure Meldrum's favorable testimony.

Third, the record does not contradict Meldrum's statement that he did not perceive a connection between his testimony and his plea agreement. Defendant's counsel asked Meldrum, "Do you see any connection, Mr. Meldrum, between your testimony in this case and the deal that you received?" Meldrum responded, "None whatsoever." Defendant argues this was false testimony. However, defendant's counsel did not ask Meldrum whether there was any connection between the trial testimony and the plea agreement; defendant's counsel asked Meldrum if he subjectively perceived a connection. The plea colloquy does not establish Meldrum's subjective view of the plea bargain. Because the record reveals that Meldrum's testimony was not changed by the plea agreement, Meldrum may have honestly believed there was no connection between his testimony and the plea agreement.

We thus conclude defendant has not shown how Meldrum's testimony was false. Accordingly, we reject defendant's perjury argument.

### 3. Prosecutorial Misconduct Argument

■ Defendant also argues that some of the prosecutor's closing remarks were im-

---

**5.** The transcript of Meldrum's plea proceeding reads as follows:

Mr. Pusey: ... It is my understanding that the State would be willing to move to amend the single count information to a Class A Attempted Unlawful Control of a trailer ... to which Mr. Meldrum would enter a plea of No Contest, to be held in Abeyance for a period of one year. The proposed terms of the plea would be that he pay $150.00 in costs and that he be on good behavior with probation to the Court.
Judge: That would be the only terms of the Plea and Abeyance?
A. That's my understanding, your honor.
Judge: Mr. Shepherd[,] is this your case?
Mr. D'Alesandro: It's mine, your honor.
Q. Why are we entering a No Contest on a theft case?
Mr. D'Alesandro: Well, there's actually a couple of reasons. Chief among them is that Mr. Meldrum, regardless of his prior position, is still involved in several felony investigations, cases that are pending and our plan at this point is to continue to prosecute those cases and with Mr. Meldrum's cooperation.
Judge: Are you telling me that a felony ... that a misdemeanor plea would disable Mr. Meldrum from being a witness?
A. No, but I think ... it wouldn't disable him but with a No Contest plea it would less likely be used for impeachment purposes[.] I guess the thought is, your honor, is that he's an expert witness and would be subject to impeachment and No Contest will have to be collaterally established in a similar fashion to what happens here today.
. . . .
Judge: O.K. It would be an accurate to state then ... that my understanding is again both the Plea in Abeyance I suppose could be premised upon lack of prior criminal history but the plea in Abeyance, at least in part, as well as the No Contest plea is so that Mr. Meldrum can in fact be more likely be able to testify as an expert witness in any pending cases, is that true?
A. That's true.
. . . .
Judge: With the understanding then the plea will be held in abeyance and not entered, Mr. Meldrum, how do you then plead to ... is it a Class A then? Is it attempted?
A. Attempted I believe.
Judge: Attempted Unlawful Control of a motor vehicle, or trailer, during the date and at a place set forth in the Information, will it be guilty or No Contest?
A. No Contest, your honor.
Q. A No Contest plea is received but not entered. I'm going to direct the clerk of the Court to hold that No Contest plea in Abeyance for one year period of time. The conditions will be # 1, your good behavior; and # 2, the payment of $150.00 court cost assessment.

proper and constitute error. We will reverse the jury's verdict on the basis of prosecutorial misconduct if defendant demonstrates that

"'[1] [t]he actions or remarks of [the prosecutor] call to the attention of the jury a matter it would not be justified in considering in determining its verdict and, [2] if so, under the circumstances of the particular case, whether the error is substantial and prejudicial such that there is a reasonable likelihood that, in its absence, there would have been a more favorable result.'"

*State v. Tenney,* 913 P.2d 750, 754 (Utah Ct.App.) (quotations omitted), *cert. denied,* 923 P.2d 693 (Utah 1996).

Defendant argues the prosecutor brought in matters the jury was not entitled to hear by manipulating the testimony they did hear. Defendant contends the prosecutor manipulated the testimony first by not revealing Meldrum's criminal history and plea bargain, then by permitting Meldrum to give false testimony in court, and then by arguing to the jury in closing remarks that Meldrum was credible as a witness. We reject Basta's argument.

■ As we have already noted, even though the prosecutor erroneously failed to provide defendant with Meldrum's criminal history and plea agreement, defendant's counsel was still able to extensively cross-examine Meldrum about his crime, arrest, and plea agreement at trial, and defendant has not demonstrated how that cross-examination would have been different had the prosecutor not committed the discovery violation. We also have rejected defendant's argument that Meldrum gave false testimony in court. Thus, we conclude that in neither of these ways did the prosecutor call to the jury's attention "a matter it would not be justified in considering in determining its verdict." *See id.*

6. Defendant argues that the prosecutor's comments in closing remarks vouched for Meldrum's credibility. We reject this argument. The prosecutor did not vouch for Meldrum's credibility. Instead, the prosecutor suggested Meldrum was credible by arguing that the act of Meldrum testifying after losing his job "says something about his integrity" and "says something about the man."

We next examine the portion of the transcript of the prosecutor's closing remarks that defendant argues was improper. The prosecutor stated:

Next, the Defense said, well, the reason you can't believe Mr. Meldrum is he's got an interest in the outcome of the case. He does? Did he get $2,000 to come in and testify like Mr. Smith? I mean, here's a man who's no longer in the fire department. He could have just said, hey, forget it, forget it, I'm no longer there, I don't really care, but the fact that Dave Meldrum comes in here and testifies and tells you the same thing that he concluded back in February says something about his integrity. It says something about the man. That was his call to make. That was his conclusion.

These remarks did not call to the jury's attention matters it was not to consider in determining the verdict. Rather, in this statement, the prosecutor stated that Meldrum had lost his job because of his crime but was still testifying to what he had concluded back in February. These facts were in evidence and any reference to Meldrum's credibility only suggested what the jury was already free to infer from the evidence.[6] *Cf. State v. Cummins,* 839 P.2d 848, 853–54 (Utah Ct.App.1992).

We therefore reject defendant's argument that the prosecutor committed prosecutorial misconduct because we conclude that the prosecutor did not call to the jury's attention a matter it would not be justified in considering in determining its verdict. As such, defendant's argument fails.

## B. The Missing Wiring

■ We next address defendant's argument that her due process rights were violated because the wiring removed from the downstairs closet was missing after Meldrum examined it,[7] precluding Smith, defendant's

7. We note that this is not a case in which the State deliberately suppressed or destroyed exculpatory evidence. In this case, the wiring somehow disappeared sometime after Meldrum examined it but before the other expert witnesses were able to examine it. Nevertheless, we echo the following advice given by the Utah Supreme

expert, from examining it in person.[8] To successfully show she was denied due process by the loss of the wiring as evidence, defendant must show that the wiring was material to showing her guilt or innocence. *See State v. Stewart*, 544 P.2d 477, 479 (Utah 1975). "The materiality required to reverse a criminal conviction for suppression or destruction of evidence as a denial of due process is more than evidentiary materiality." *State v. Nebeker*, 657 P.2d 1359, 1363 (Utah 1983). Instead, the defendant must show the evidence is material in the constitutional sense. *See id.; State v. Jiminez*, 761 P.2d 577, 578 (Utah Ct.App.1988).

> "Constitutional materiality requires that there be a showing that the suppressed or destroyed evidence is vital to the issues of whether the defendant is guilty of the charge and whether there is a fundamental unfairness that requires the Court to set aside the defendant's conviction. A corollary of this proposition is, 'The mere *possibility* that an item of undisclosed information *might* have helped the defense, or *might* have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' "

*Jiminez*, 761 P.2d at 578–79 (quoting *State v. Lovato*, 702 P.2d 101, 106 (Utah 1985) (citation omitted) (quoting *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976)) (emphasis in *Lovato* )); *accord Nebeker*, 657 P.2d at 1363.

■ We conclude that defendant has not shown the missing wiring was constitutionally material. Although defendant's expert's theory was that the wiring played a significant role in starting the fire, he was still able to reach that conclusion based on the photographs of the wiring Meldrum took during his investigation. Defendant's expert testified that he would have preferred to examine the wiring in person, but that he could derive the necessary information about the wiring from the photographs.

In addition, none of the other experts who testified considered the wiring vitally important to determining the fire's cause and origin. Meldrum's conclusion that the fire was not started by the wiring in the closet was arrived at in part by his examination of the wiring, but it was also, in large part, derived from his overall examination of the fire scene and determination that the fire began on the family room floor. That conclusion was also reached by the State's other two experts, who, like Smith, were unable to examine the missing wiring but did not consider that inability significant. Thompson was unconcerned that the wiring was unavailable because he had concluded during his investigation of the fire scene that the wall containing the wiring had nothing to do with causing the fire, and that the fire originated lower to the floor, away from the wall. Thus, Thompson concluded that any information the wiring contained was not important to determining the fire's cause and origin. Peak also concluded the wiring had no exculpatory value. Although Peak would have liked to examine the wiring to have a more complete examination, he did not think that his inability to examine it affected his ability to determine that electricity did not cause the fire. Peak's conclusion was based on his examination of the burn patterns at the fire scene and of other electrical mechanisms, his observation that the type of damage he would have expected to see had the wiring caused the fire did not exist, and his determination that the wall was not in the area in which the fire originated.[9]

Court in *State v. Stewart*, 544 P.2d 477, 479 (Utah 1975):

> We think it advisable that those charged with investigation and prosecution of crime retain all records and other evidence pertaining to the case until it is finally disposed of. By adopting such a practice, a claim of unfairness by one charged with a criminal offense would be groundless.

8. Defendant also argues that the State's failure to preserve the fire scene so her expert could investigate it warrants a new trial. However, defendant never develops this argument. We therefore only address the argument she develops regarding the missing wiring. *See* Utah R.App. P. 24(a)(9); *Vigil*, 922 P.2d at 25.

9. Based on his experience fighting the fire and subsequent examination of the fire scene, Durrant also testified that he thought the fire originated in the family room.

Because defendant has not demonstrated to us how the missing wiring was vital to proving defendant's innocence, and because three of the four experts who testified at trial concluded the wiring was not vital to determining how or even where the fire started, this court is left simply to speculate on the affect the wiring would have had on the jury had it been preserved. Thus, we are only left with the possibility that the wiring might have affected the trial's outcome. Such a possibility does not rise to the level of constitutional materiality.

Because defendant has not shown that the loss of the wiring was vital to the issue of her guilt, we conclude she has not shown the wiring was constitutionally material, and we thus reject her argument.[10]

## CONCLUSION

We affirm defendant's convictions. Although the prosecutor committed a discovery violation, defendant has not demonstrated that a reasonable likelihood exists that without the prosecutor's discovery violation she would have received a more favorable result at trial. Furthermore, we reject defendant's perjury and prosecutorial misconduct arguments because we conclude the record does not support either that Meldrum falsely testified or that the prosecutor called to the jury's attention a matter it would not be justified in considering in determining its verdict. We also reject defendant's argument that she was denied due process because the downstairs closet wiring was missing. Although it would have been preferable to have the wiring available, defendant has not demonstrated that the wiring was vital to

showing her innocence, and thus was constitutionally material.[11]

We affirm.

BILLINGS, J., concurs.

BENCH, J., concurs in the result.

10. We have also carefully considered defendant's argument that the prosecutor's attack on Smith because of Smith's inability to personally examine the wiring was unfair. We agree that the prosecutor's attack was not in the best of taste, but conclude it did not rise to either the level of prosecutorial misconduct, as it did not address facts the jury was not already privy to, nor did it deprive defendant of a fair trial. Defendant's counsel presented evidence at trial why the wiring was missing and why Smith could not examine the fire scene, and the jury could use that

information to judge the testimony and arguments presented.

11. Defendant also argues that a high likelihood exists that her trial would have had a different outcome without the cumulation of errors in her trial that she complains of on appeal. *See State v. Young,* 853 P.2d 327, 367 (Utah 1993) (plurality opinion). However, because we have not identified multiple errors in this case, the cumulative error doctrine does not apply. *See Parsons v. Barnes,* 871 P.2d 516, 530 (Utah 1994).